[931 NE2d 87, 905 NYS2d 118]

DDJ MANAGEMENT, LLC, et al., Appellants, v RHONE GROUP L.L.C. et al., Respondents, et al., Defendants.

Argued June 2, 2010; decided June 24, 2010

**POINTS OF COUNSEL**

*Law Offices of Arnold M. Weiner* (*Arnold M. Weiner* of the Maryland bar, admitted pro hac vice, and *Barry L. Gogel* of counsel), *Epstein Becker & Green, P.C.*, New York City (*Barry A. Cozier* and *Ralph A. Berman* of counsel), and *Whiteford, Taylor & Preston, L.L.P.*, Baltimore, Maryland (*William F. Ryan, Jr., Edward M. Buxbaum* and *Dwight W. Stone, II,* of counsel), for appellants. I. The Appellate Division erred in performing its

review of the sufficiency of the complaint on motions to dismiss under CPLR 3211 (a). (*Knight Sec. v Fiduciary Trust Co.,* 5 AD3d 172; *Sokoloff v Harriman Estates Dev. Corp.,* 96 NY2d 409; *Nonnon v City of New York,* 9 NY3d 825.) II. There is no support in existing New York case law for the Appellate Division's harsh bright-line rule. (*Metropolitan Coal Co. v Howard,* 155 F2d 780; *CBS Inc. v Ziff-Davis Publ. Co.,* 75 NY2d 496; *National Conversion Corp. v Cedar Bldg. Corp.,* 23 NY2d 621; *Jo Ann Homes at Bellmore v Dworetz,* 25 NY2d 112; *Merrill Lynch & Co. Inc. v Allegheny Energy, Inc.,* 500 F3d 171; *Faller Group, Inc. v Jaffe,* 564 F Supp 1177; *Emergent Capital Inv. Mgt., LLC v Stonepath Group, Inc.,* 343 F3d 189; *Lazard Freres & Co. v Protective Life Ins. Co.,* 108 F3d 1531; *Turkish v Kasenetz,* 27 F3d 23; *Spyder Enters., Inc. v Ward,* 872 F Supp 8.) III. The decision of the First Department threatens to have a chilling effect upon commercial lending and is therefore inconsistent with sound public policy. (*Abu Dhabi Commercial Bank v Morgan Stanley & Co.,* 651 F Supp 2d 155.)

*Wachtell, Lipton, Rosen & Katz,* New York City (*Herbert M. Wachtell, Ben M. Germana, Emil A. Kleinhaus* and *Adam P. Schleifer* of counsel), and *Sullivan & Cromwell LLP* (*Brian T. Frawley* and *Naomi D. Johnson* of counsel) for Rhone Group L.L.C. and others, respondents. I. The complaint fails to allege facts showing reasonable reliance. (*Global Mins. & Metals Corp. v Holme,* 35 AD3d 93, 8 NY3d 804; *Abrahami v UPC Constr. Co.,* 224 AD2d 231; *Schumaker v Mather,* 133 NY 590; *Danann Realty Corp. v Harris,* 5 NY2d 317; *Sylvester v Bernstein,* 283 App Div 333, 307 NY 778; *Lanzi v Brooks,* 54 AD2d 1057, 43 NY2d 778; *Dragon Inv. Co. II LLC v Shanahan,* 49 AD3d 403; *Valassis Communications v Weimer,* 304 AD2d 448; *UST Private Equity Invs. Fund v Salomon Smith Barney,* 288 AD2d 87; *Orlando v Kukielka,* 40 AD3d 829.) II. Appellants' and amici's "public policy" arguments are meritless. (*CBS Inc. v Ziff-Davis Publ. Co.,* 75 NY2d 496.)

*Nixon Peabody LLP,* New York City (*Christopher M. Mason* and *Leah R. Threatte* of counsel), for Quilvest S.A. and others, respondents. I. Plaintiffs did not plead or offer facts showing reasonable reliance as to Quilvest S.A., Quilvest Services Ltd., and Quilvest American Equity Ltd. (*Global Mins. & Metals Corp. v Holme,* 35 AD3d 93, 8 NY3d 804; *Wendel v Wendel,* 30 App Div 447; *Daly v Kochanowicz,* 67 AD3d 78; *Dragon Inv. Co. II LLC v Shanahan,* 49 AD3d 403; *Lusins v Cohen,* 49 AD3d 1015; *Orlando v Kukielka,* 40 AD3d 829; *Permasteelisa, S.p.A. v*

*Lincolnshire Mgt., Inc.,* 16 AD3d 352; *Barrett v Huff,* 6 AD3d 1164; *Valassis Communications v Weimer,* 304 AD2d 448; *UST Private Equity Invs. Fund v Salomon Smith Barney,* 288 AD2d 87.) II. Public policy does not favor allowing a lender to conclude a large financial transaction without conducting appropriate due diligence.

*Dorsey & Whitney LLP (Juan C. Basombrio,* of the California bar, admitted pro hac vice) and *Dorsey & Whitney LLP,* New York City (*Marc S. Reiner* of counsel), for Scott Duncan, respondent. The claim against Scott Duncan fails for the reasons set forth in the briefs submitted by the other defendants-respondents. (*Walton v New York State Dept. of Correctional Servs.,* 8 NY3d 186; *Schiavone v City of New York,* 92 NY2d 308; *Ziecker v Town of Orchard Park,* 75 NY2d 761; *McCain v Koch,* 70 NY2d 109.)

*Holland & Knight LLP,* New York City (*Christelette A. Hoey* of counsel), and *Holland & Knight LLP,* Chicago, Illinois (*Robert H. Lang* of counsel), for John Jendrzejewski, respondent. The unanimous decision of the Appellate Division should be affirmed. (*Dragon Inv. Co. II LLC v Shanahan,* 49 AD3d 403; *Zanett Lombardier, Ltd. v Maslow,* 29 AD3d 495; *Permasteelisa, S.p.A. v Lincolnshire Mgt., Inc.,* 16 AD3d 352.)

*Wilmer Cutler Pickering Hale and Dorr LLP,* New York City (*James H. Millar* and *Janet R. Carter* of counsel), *Wilmer Cutler Pickering Hale and Dorr LLP,* Boston, Massachusetts (*Tristan C. Snell* of counsel), *Elliot Ganz,* New York City, *Otterbourg, Steindler, Houston & Rosen, P.C.,* New York City (*Jonathan N. Helfat* and *Richard G. Haddad* of counsel), *Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd.,* Chicago, Illinois (*Richard M. Kohn* of counsel), and *Joseph R. Alexander,* New York City, for Loan Syndications and Trading Association and others, amici curiae. I. The First Department's proposed rule is contrary to long-standing public policy governing commercial transactions. (*Credit Francais Intl. v Sociedad Fin. de Comercio,* 128 Misc 2d 564; *Metropolitan Coal Co. v Howard,* 155 F2d 780; *CBS Inc. v Ziff-Davis Publ. Co.,* 75 NY2d 496; *Pramco III, LLC v Partners Trust Bank,* 16 Misc 3d 351; *Merrill Lynch & Co. Inc. v Allegheny Energy, Inc.,* 500 F3d 171.) II. The First Department's harsh bright-line rule is not supported by its prior cases and conflicts with persuasive Second Circuit case law. (*UST Private Equity Invs. Fund v Salomon Smith Barney,* 288 AD2d 87; *Global Mins. & Metals Corp. v Holme,* 35 AD3d 93, 8 NY3d 804; *Abrahami v*

*UPC Constr. Co.,* 224 AD2d 231; *Permasteelisa, S.p.A. v Lincoln-shire Mgt., Inc.,* 16 AD3d 352; *Merrill Lynch & Co. Inc. v Allegheny Energy, Inc.,* 500 F3d 171; *Metropolitan Coal Co. v Howard,* 155 F2d 780; *Mallis v Bankers Trust Co.,* 615 F2d 68.)

## OPINION OF THE COURT

SMITH, J.

We hold that plaintiffs in this action for fraud have alleged facts from which a jury could find that they were justified in relying on the representations defendants made to them.

### I

Plaintiffs are four companies that loaned a total of $40 million in March of 2005 to American Remanufacturers Holdings, Inc. and affiliated companies (ARI). ARI was a remanufacturer of automobile parts; it purchased used parts, broke them down into their components, and used the components to make new parts. ARI's stock was owned 45% by entities affiliated with Rhone Group L.L.C., and 55% by entities affiliated with Quilvest S.A.

After ARI failed to repay the loan, plaintiffs brought a number of claims against Rhone, Quilvest, companies and individuals associated with them, members of ARI management, and ARI's outside accountants. Only the first claim is in issue here. It asserts in essence that Rhone and Quilvest, their corporate affiliates and individuals acting on their behalf (hereafter defendants) defrauded plaintiffs into making the loans.

Plaintiffs allege, among other things, that defendants presented them with ARI financial statements that were false and misleading. More specifically, they allege that the financial statements were designed to inflate the number with which plaintiffs were most concerned—ARI's earnings before interest, taxes, depreciation and amortization (EBITDA). The allegations on this subject are lengthy, and include some striking details. An e-mail sent to one of the defendants by an ARI executive about two months before the loan closing says: "I understand the financial reason to manipulate earnings." Another e-mail, sent some three weeks later by the same officer to the same recipient says: "I realize we needed to make EBITDA for banks but we should understand . . . what our true EBITDA is."

We need not describe defendants' alleged misconduct fully; we may assume, for purposes of this appeal, that the complaint

adequately alleges that defendants made material misrepresentations. The question for us is whether, if the complaint's allegations are true, a jury could find that plaintiffs justifiably relied on those misrepresentations. Defendants argue that plaintiffs failed to make a reasonable inquiry into the truth of what defendants said, and we will describe in more detail the alleged facts that are relevant to that argument.

The complaint alleges that plaintiffs were first solicited to loan money to ARI in July 2004, and that over the next several months they received a number of written presentations by ARI's investment banker, containing financial and other information that later proved to be false or misleading. At the time of the solicitation—and indeed until the day the loan closed— ARI's outside auditors had not completed their audit for the year ending December 31, 2003, and it was part of the original proposal that the loans would be "conditioned upon, and made after, the borrower had provided the lenders" with audited financial statements for 2003. It was later agreed that unaudited financial statements for 2004 would also be provided.

During the months before those financial statements were completed, plaintiffs had several conversations with ARI representatives in which they were given reassuring information, and made two calls to participants in the industry to get information about ARI's management, which was also reassuring. In December 2004 and January 2005, plaintiffs were sent drafts of the audit report for 2003, and on March 2, 2005 they were sent the unaudited financial statements for 2004. The final version of the 2003 audit report was provided on March 22, 2005, and the loan closed on the same day.

ARI's unaudited 2004 statements, plaintiffs allege, grossly inflated EBITDA, in significant part through a manipulation of ARI's inventory reserves. Plaintiffs say that they could not have detected this, but, as defendants point out, the 2004 statements contained some features that might have aroused concern in a skeptical reader who examined them carefully. They showed a significant increase in the value of ARI's inventory over the previous year; a modest amount of cash on hand, equal to the amount of ARI's bank overdraft; and a remarkable increase in the company's apparent profitability in the last month of the year. Though December 2004 revenues were below the year's monthly average, gross profit was higher than average, and gross margin was shown as 17.9% for the month, compared to 13.5% for the year as a whole.

The complaint does not allege that plaintiffs asked questions about these or other aspects of the financial statements, or that they asked to look at ARI's underlying records. Plaintiffs did, however, insist that ARI represent and warrant, in substance, that the financial statements were accurate. Specifically, ARI represented and warranted in the loan agreement (as summarized in the complaint) that the 2004 financial statements "present fairly in all material respects the financial position of ARI as at December 31, 2004 and the results of ARI's operations and cash flows for the period then ended"; that the statements were prepared in accordance with generally accepted accounting principles; that "between December 31, 2003 and March 22, 2005 [the closing date], no event has occurred, which alone or together with other events, could reasonably be expected to have a Material Adverse Effect" on ARI's business, assets, operations or prospects or its ability to repay the loans; and that "no information contained in the loan agreement, the other loan documents or the financial statements being furnished to the Plaintiffs contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which they were made." All of these representations and warranties, plaintiffs say, later proved to be false.

The loan agreement, as defendants emphasize, also provided for a high interest rate: ARI agreed to pay plaintiffs the lower of 10% above the LIBOR rate or 9% above an index rate derived from the "base rate" charged by United States banks to corporate borrowers.

As we mentioned above, plaintiffs' claim for fraud against defendants was one of several in the complaint. On motions pursuant to CPLR 3211, Supreme Court dismissed all the others, but allowed this claim to stand (19 Misc 3d 1124[A], 2008 NY Slip Op 50839[U]). The Appellate Division modified Supreme Court's decision and dismissed the claim, emphasizing that "plaintiffs never looked at ARI's books and records" and concluding that, having failed to do so, they "cannot now properly allege reasonable reliance on the purported misrepresentations" (*DDJ Mgt., LLC v Rhone Group L.L.C.*, 60 AD3d 421, 424 [1st Dept 2009]). We granted leave to appeal (13 NY3d 710 [2009]), and now reverse.

## II

The rule defendants rely on was stated more than a century ago in *Schumaker v Mather* (133 NY 590, 596 [1892]):

"[I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." (*See also Danann Realty Corp. v Harris*, 5 NY2d 317, 322 [1959].)

This rule has been frequently applied in recent years where the plaintiff is a sophisticated business person or entity that claims to have been taken in. In some cases, the rule serves to rid the courts of cases in which the claim of reliance is likely to be hypocritical. Thus in *Global Mins. & Metals Corp. v Holme* (35 AD3d 93 [1st Dept 2006]), the plaintiff had fired an officer whom it found to be untrustworthy, and given him a general release. Later, it claimed to have trusted, without verifying, the officer's assurances as to the innocent nature of a particular transaction. The Appellate Division held such trust to be unjustified. In other cases, the rule rejects the claims of plaintiffs who have been so lax in protecting themselves that they cannot fairly ask for the law's protection. In *Lampert v Mahoney, Cohen & Co.* (218 AD2d 580, 582 [1st Dept 1995]), the Appellate Division dismissed the claim of a plaintiff who said "that he loaned some $3 million to a corporate entity and its principal without ever investigating the financial condition of the business beyond obtaining some vague verbal assurances from its accountant." In cases like *Global Minerals* and *Lampert*, the plaintiff "may truly be said to have willingly assumed the business risk that the facts may not be as represented" (*Rodas v Manitaras*, 159 AD2d 341, 343 [1st Dept 1990]).

Where, however, a plaintiff has taken reasonable steps to protect itself against deception, it should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred. In particular, where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry. Indeed, there are many cases in which the plaintiff's *failure* to obtain a specific, written representation is given as a reason for finding reliance to be unjustified (*see e.g. Curran, Cooney, Penney v Young & Koomans*, 183 AD2d 742, 743-744

[2d Dept 1992]; *Rodas v Manitaras*, 159 AD2d at 343; *Emergent Capital Inv. Mgt., LLC v Stonepath Group, Inc.*, 343 F3d 189, 196 [2d Cir 2003] [applying New York law]). It is harder to find cases holding that a plaintiff who did obtain such a representation could not justifiably rely on it; one such case is *Ponzini v Gatz* (155 AD2d 590 [2d Dept 1989]), in which the plaintiff's attorney actually knew that the warranty in question was false. In *National Conversion Corp. v Cedar Bldg. Corp.* (23 NY2d 621 [1969])—a case admittedly much different in its facts from this one—we held that it was reasonable for the plaintiff to rely on a written representation as a substitute for making an investigation of the facts represented.

"The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive" (*Schlaifer Nance & Co. v Estate of Warhol*, 119 F3d 91, 98 [2d Cir 1997]). No two cases are alike in all relevant ways. However, several federal cases applying New York law bear a noticeable resemblance to this one—and all of them hold that the plaintiffs' claims of justifiable reliance were legally sufficient (*Merrill Lynch & Co. Inc. v Allegheny Energy, Inc.*, 500 F3d 171, 181-182 [2d Cir 2007]; *Barron Partners, LP v Lab123, Inc.*, 2008 WL 2902187, 2008 US Dist LEXIS 56899 [SD NY 2008]; *JP Morgan Chase Bank v Winnick*, 350 F Supp 2d 393 [SD NY 2004]; *Faller Group, Inc. v Jaffe*, 564 F Supp 1177 [SD NY 1983]).

*JP Morgan* is perhaps the case most similar to ours. Plaintiffs there were banks that had extended credit to Global Crossing, Ltd. (GC). After it became insolvent, the banks sued GC's officers, directors and employees for fraud. The District Court denied defendants' motion for summary judgment on the fraud claims, rejecting the argument "that the plaintiffs cannot demonstrate reliance on the alleged misrepresentations" (350 F Supp 2d at 404). The court emphasized that plaintiffs had bargained for a provision in their credit agreement with GC to the effect that "each loan request was 'deemed' a 'representation and warranty' by GC that no 'event of default' had occurred" (*id.* at 396). Examining the facts of several state and federal cases applying New York law, the court concluded that they "do not support the interpretation that a duty to inquire is necessarily triggered as soon as a plaintiff has the slightest 'hints' of any 'possibility' of falsehood" (*id.* at 408). The court said:

"It is undisputed that the Banks expressly bargained

not only for the right to examine GC's books and records, but also for the provision of the Agreement deeming each borrowing request to be a representation that GC remained in compliance with its debt covenants at the time the request was made. Under these circumstances, it cannot be argued that the Banks failed to bargain for adequate safeguards to establish, at least initially, the basis for their reliance on the defendants' representations" (*id.* at 409).

Noting the defendants' argument "that GC's . . . financial statements . . . were so transparently false—or at least, that the assumptions on which they were based were so apparently questionable—that no reasonable banker would have lent GC a penny without conducting further inquiry into their accuracy" (*id.*), the court found that the question it presented was for the jury. The court was unable to say as a matter of law that "a reasonable lender of equivalent experience should have inquired further" into GC's financial statements (*id.* at 411).

■ We reach a similar conclusion here. It is fair to say that there were hints from which plaintiffs might have been put on their guard in this transaction. Some aspects of the 2004 financial statements—particularly the sudden improvement in profitability in the last month of the year—might have seemed too good to be true; the fact that it took an auditor until March of 2005 to complete an examination of the 2003 financial statements was hardly encouraging; and the high interest rate itself demonstrates that plaintiffs knew the transaction carried considerable risk. But plaintiffs made a significant effort to protect themselves against the possibility of false financial statements: they obtained representations and warranties to the effect that nothing in the financials was materially misleading. We decline to hold as a matter of law that plaintiffs were required to do more—either to conduct their own audit or to subject the preparers of the financial statements to detailed questioning. If plaintiffs can prove the allegations in the complaint, whether they were justified in relying on the warranties they received is a question to be resolved by the trier of fact.

■ Defendants emphasize that the warranties were given only by ARI, and suggest that they cannot support a claim against Rhone, Quilvest and others. But this argument blurs the distinction between claims for breach of warranty and claims

for fraud. It is true that, as a contractual matter, the only rights plaintiffs acquired under the warranties were against ARI. If plaintiffs prove only that the warranties were false, they cannot recover against Rhone and Quilvest. But if they can prove that Rhone and Quilvest knew the facts represented and warranted were false—in other words, that Rhone and Quilvest knew the financial statements gave an untrue picture of ARI's financial condition—the case is different. It can be inferred from the allegations of the complaint that plaintiffs believed Rhone and Quilvest would not knowingly cause a company they controlled to make false representations in a loan agreement as to the accuracy of financial statements. We cannot say as a matter of law that this was an unjustifiable belief.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed with costs, and the case remitted to the Appellate Division for consideration of questions raised but not determined on the appeal to that court.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ, PIGOTT and JONES concur.

Order, insofar as appealed from, reversed, with costs, and case remitted to the Appellate Division, First Department, for consideration of issues raised but not determined on the appeal to that court.