■ ACA FINANCIAL GUARANTY CORP., Respondent, v GOLDMAN, SACHS & Co., Appellant. [967 NYS2d 1]—

Order, Supreme Court, New York County (Barbara R. Kapnick, J.), entered April 24, 2012, which, to the extent appealed, denied defendant's motion to dismiss the causes of action for fraudulent inducement and fraudulent concealment, reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment dismissing the amended complaint.

Plaintiff alleges that it was fraudulently induced to issue a financial guaranty for a portion of an investment by defendant's misrepresentation that a nonparty hedge fund was taking a long position in the investment when in fact, such fund was actually a short seller, which was influencing the selection of the reference portfolio it was effectively betting against.

The motion court erred when it denied defendant's motion to dismiss plaintiff's causes of action for fraud. While we agree that plaintiff adequately pleaded all of the requisite elements comprising a fraud claim (*Dembeck v 220 Cent. Park S., LLC*, 33 AD3d 491, 492 [1st Dept 2006] ["To make a prima facie claim of fraud, the complaint must allege misrepresentation or concealment of a material fact, falsity, scienter on the part of the wrongdoer, justifiable reliance and resulting injury"]), plaintiff's amended complaint nevertheless fails to establish justifiable reliance as a matter of law. Indeed, plaintiff fails to plead that it exercised due diligence by inquiring about the nonpublic information regarding the hedge fund with which it was in contact prior to issuing the financial guaranty, or that it inserted the appropriate prophylactic provision to ensure against the possibility of misrepresentation (*see Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 76 AD3d 310, 320-321 [1st Dept 2010], *affd* 17 NY3d 269 [2011]). In *Centro Empresarial Cempresa S.A.*, we dismissed plaintiffs' complaint alleging, inter

alia, fraud, holding that the fraud claim was barred by the omission of necessary language in the release between the parties (*id.*). Specifically, we stated that "[i]f plaintiffs did not intend to release claims of fraud . . . , they should have insisted on access to . . . internal books and records . . . [and] if plaintiffs did not wish to forgo suing on a fraud claim they might discover in the future, these sophisticated and well-counseled entities should have insisted that the release [barring future claims] be conditioned on the truth of the financial information provided by defendants (whether directly or through public filings) on which plaintiffs were relying. In essence, by entering into the 2003 sale of their interests in reliance on defendants' unverified representations concerning [defendant's] financial condition, without inserting into the agreement a prophylactic provision to ensure against the possibility of misrepresentation plaintiffs may truly be said to have willingly assumed the business risk that the facts may not be as represented" (*id.* [internal quotation marks, citations and ellipsis omitted]; *see also Graham Packaging Co., L.P. v Owens-Illinois, Inc.*, 67 AD3d 465 [1st Dept 2009]; *Permasteelisa, S.p.A. v Lincolnshire Mgt., Inc.*, 16 AD3d 352 [1st Dept 2005]; *cf. DDJ Mgt., LLC v Rhone Group L.L.C.*, 15 NY3d 147, 154 [2010]).

Here, in agreeing with the motion court's denial of defendant's motion, the dissent attempts to distinguish our holding in *Centro Empresarial Cempresa S.A.* (76 AD3d 310), where we held that a fraud claim is barred where a sophisticated and well-counseled entity fails to include an appropriate prophylactic provision in the agreement governing the transaction from which the legal dispute arises to ensure against the possibility of misrepresentation (*id.* at 320-321). Since the release in that action was part and parcel of the agreement between the parties, we reject the dissent's attempt to limit our holding in *Centro Empresarial Cempresa S.A.* to cases where contracting parties fail to insert in a release appropriate prophylactic provisions to ensure against the possibility of misrepresentation. Proof that our holding in *Centro Empresarial Cempresa S.A.* is not so limited is found in *Graham Packaging Co.* (67 AD3d 465), where we affirmed the dismissal of defendants' counterclaim for fraudulent concealment since they failed to, inter alia, insert "a prophylactic provision in the *settlement agreement* to limit their exposure" (*id.* at 465 [emphasis added]). Similarly, in *Permasteelisa, S.p.A.* (16 AD3d 352), we affirmed dismissal of plaintiff's cause of action for fraud when, inter alia, it failed to insert "a prophylactic provision in the *purchase agreement* to ensure against the possibility of misrepresentation" (*id.* at 352 [emphasis added]).

Equally unavailing is the dissent's attempt to distinguish this case from *Centro Empresarial Cempresa S.A.* on the ground that the relationship between the parties here was not adversarial, thereby implying that our holding in *Centro Empresarial Cempresa S.A.* was limited to transactions between adverse parties. Notwithstanding that in that case we noted that the parties were in an adversarial and hostile relationship (*id.* at 320-321), nothing in *Centro Empresarial Cempresa S.A.* limited its holding to adverse transacting parties; nor could it, since parties are seldom, if ever, adversaries at the outset of a transaction, when the terms of an agreement are ordinarily crafted. Instead, parties amicably transacting business often become adversaries when, as here, they meet in court averring that one party wronged the other. A well crafted agreement should protect against this very eventuality. More specifically, because parties can seldom be certain that the representations made by other contracting parties are indeed true, they must—lest their cause of action for fraud be barred—insert the requisite prophylactic provision to ensure against the possibility of misrepresentation. Notably, the dissent's attempt to characterize the nature of the relationship between the parties here as one of trust and good faith is belied by the allegations in plaintiff's own complaint, which, as noted by the dissent, evinces that prior to the execution of the agreement between the parties, plaintiff, via email, sought confirmation from defendant regarding the nonparty hedge fund's role and position in the transaction. Accordingly, it is clear that notwithstanding plaintiff's understanding as to the nature of the transaction and the roles of all parties concerned, it nevertheless sought assurances from the defendant presumably to prevent a misunderstanding and/or the very fraud for which it now sues.

Moreover, the dissent's position is particularly unpersuasive insofar as plaintiff could have, upon further inquiry, uncovered the nonparty hedge fund's actual position, but apparently chose not to (*Centro Empresarial Cempresa S.A.*, 76 AD3d at 319-320; *Graham Packaging Co.*, 67 AD3d at 465; *Permasteelisa, S.p.A.*, 16 AD3d at 352). Specifically, plaintiff received, inter alia, the offering circular for the transaction, which expressly disclosed that no one was investing in the first-loss tranche. This information should have alerted plaintiff that contrary to the representations made, the nonparty hedge fund was not funding a portion of the transaction at all, let alone in the manner represented (i.e., by taking the equity or long position). Therefore, plaintiff should have questioned defendant or the nonparty hedge fund; such an inquiry would have likely informed plaintiff that the nonparty hedge fund was taking a short rather than

the long equity position represented. We reject the dissent's assertion that the absence of any funding of the first loss tranche was attributable to the fact that the nonparty hedge fund was purportedly funding the first-loss tranche by taking the long position on a credit default swap. This assertion does not explain why the tranche was completely unfunded, since even the funding mechanism perceived by plaintiff—the credit default swap—should have had a value and thus should have been listed in the offering circular.

In sum, plaintiff's fraud claims based on the allegation that plaintiff, a highly sophisticated commercial entity, was misled into believing that a nonparty hedge fund would take a long position in the first-loss tranche of the collateral debt obligation, in alignment with plaintiff's interests, must be dismissed because: (1) such misrepresentations were specifically contradicted by the offering circular's disclosure that no such equity position was being taken; (2) plaintiff's alleged reliance on such misrepresentations would have been contrary to its acknowledgment (as set forth in the offering circular) that, in entering into the transaction, it was "not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of [defendant] . . . other than in the final offering circular for [the transaction] and any representations expressly set forth in a written agreement with such party," and that defendant was not "acting as a fiduciary or financial or investment adviser for the purchaser"; and (3) the hedge fund's intentions with regard to this investment were not peculiarly within defendant's knowledge and plaintiff, although it was in direct contact with the hedge fund, failed to ask the hedge fund what position it intended to take in this investment (*see Danann Realty Corp. v Harris*, 5 NY2d 317 [1959]; *HSH Nordbank AG v UBS AG*, 95 AD3d 185 [1st Dept 2012]).

In view of the foregoing, it is unnecessary to address defendant's remaining contentions. Concur—Friedman, J.P., Renwick, and Román, JJ.

Manzanet-Daniels and Clark and, JJ., dissent in a memorandum by Clark, J., as follows: Plaintiff has adequately alleged justifiable reliance, inasmuch as the documentary evidence established that plaintiff performed an exercise of reasonable due diligence. I would therefore affirm the order of the motion court denying defendant's motion to dismiss.

ACA Financial Guaranty Corp., plaintiff herein, issued a financial guaranty policy that "wrapped" ABACUS 2007-ACI, a financial product known as a synthetic collateralized debt

obligation (CDO).[1] A financial guarantor insurer such as plaintiff issues a policy guaranteeing payment of senior notes in or above a specified tranche in the capital structure, known as the "attachment point."

Plaintiff alleges that defendant, Goldman, Sachs & Co. (Goldman), conceived and marketed ABACUS based on a portfolio of investment securities selected by its hedge fund client, Paulson & Co., Inc. (Paulson). Plaintiff alleges that ABACUS was designed to fail so that Paulson could reap large profits by shorting the portfolio and Goldman could in turn reap huge fees.

It is standard industry practice for a "transaction sponsor," as Paulson is alleged to have been, to precommit to invest in the CDO by investing in the equity tranche. The equity tranche suffers the first loss in the event the portfolio performs poorly. As a direct result, the transaction sponsor has a strong economic incentive to have a high-quality reference portfolio.[2] The transaction sponsor normally takes the "long" position, betting that the portfolio will perform well.

Plaintiff alleges that defendant deceived it into believing that Paulson was a long investor in ABACUS, whose interests "aligned" with those of plaintiff as insurer. In fact, however, defendant knew that Paulson intended to take an enormous short position in ABACUS, i.e., that it stood to profit if the portfolio performed poorly.

The complaint alleges that by 2006, Paulson was convinced that the market for subprime residential mortgage-backed securities (RMBS) was on the verge of collapse. Paulson allegedly sought a way to make a billion dollar profit on the failure of a portfolio of RMBS through a single transaction. The complaint alleges that Paulson did not want to take the short position in just any portfolio of RMBS, but in one that it had selected in the belief that it was most likely to default.

---

1. To establish a CDO, an investment bank like defendant incorporates a special purchase vehicle (SPV) to which equity investors contribute capital. In a synthetic CDO, the SPV acts as the protection seller in one or more credit default swaps referencing a portfolio of collateral. The protection seller takes the long position, i.e., it profits if the reference portfolio performs well, and the protection buyer takes the short position, i.e., it profits if the reference portfolio performs poorly.

2. The complaint alleges that defendant accomplished this result through a separate credit default swap between defendant and Paulson, which defendant concealed from plaintiff. Plaintiff's position is that Paulson, by purchasing from defendant the protection on the reference portfolio that defendant had purchased from the SPV, became the ultimate and undisclosed protection buyer, i.e., a short investor in ABACUS with an economic incentive to select reference obligations that would default.

The complaint further alleges that Paulson set out to find an investment bank that would structure, underwrite and sell the portfolio of RMBS, and broker Paulson's purchase of protection on the portfolio. The complaint notes that at least one investment bank approached by Paulson, Bear Stearns, declined to assist Paulson, fearing for its reputation. Scott Eichel of Bear Stearns, who met with Paulson several times, allegedly was quoted as saying that Paulson wanted "especially ugly mortgages for the CDOs, like a bettor asking a football owner to bench a star quarterback to improve the odds of his wager against the team." Eichel stated that the transaction "didn't pass ethics standards . . . We didn't think we should sell deals that someone was shorting on the other side."

Paulson thereafter approached defendant's structured products correlation trading desk. Despite an acknowledged "reputational risk," defendant agreed to underwrite the transaction on behalf of Paulson, with which defendant had done $7 billion in transactions prior to ABACUS. Defendant's internal memos plainly identified Paulson, and Paulson's economic interest in ABACUS, stating that defendant was "effectively working an order for Paulson to buy protection on [i.e., short] specific layers of the [ABACUS] capital structure."

The complaint alleges that defendant soon learned that if it were disclosed that Paulson, the transaction sponsor, intended to take a massive short position against the portfolio, it would not be able to find a portfolio selection agent for the product, much less a financial guaranty insurer who would wrap the super-senior portion of the capital structure. Less than a week before approaching plaintiff, defendant approached GSC Partners to act as the portfolio selection agent for ABACUS, explicitly disclosing that Paulson intended to short the reference portfolio. GSC declined to act as portfolio selection agent, informing defendant, "I do not have to say how bad it is that you guys are pushing this thing."

On January 8, 2007, a subsidiary of plaintiff met with Paulson at Paulson's offices to discuss the proposed transaction including, inter alia, the RMBS to be included in the reference portfolio. In contrast to the candid disclosure made to GSC regarding Paulson's short interest, Paulson did not disclose to plaintiff's representatives that it intended to short the reference portfolio.

In response to plaintiff's emails seeking clarification regarding how Paulson intended to "participate" in ABACUS, defendant, in an email dated January 10, 2007, purported to supply a "Transaction Summary." This summary not only failed to dis-

close Paulson's short position, but, as alleged, it affirmatively misrepresented that Paulson had precommitted to take a long position. Defendant identified Paulson as the "transaction sponsor"—which, as noted above is typically the equity investor. Further, in an email dated January 10, defendant stated that the economic interests of Paulson and plaintiff in ABACUS were "align[ed]." In summarizing the capital structure, defendant described the 0% to 9% tranche, i.e., the equity tranche, as "pre-committed first loss." The CDO had not been launched, or marketed to prospective investors, making Paulson the only possible entity "pre-committed" to invest in the equity tranche. The amended complaint further alleges that on February 23, 2007, defendant again misrepresented that Paulson had agreed to be the equity investor in ABACUS during a telephone call between Goldman and ACAM (plaintiff's subsidiary), where Goldman allegedly represented that Paulson was "looking 0-10%," which describes the equity tranche, a long position.

Plaintiff alleges that defendant engaged in this misconduct notwithstanding an acknowledgment that its participation constituted a "reputational risk," and has since settled Securities and Exchange Commission (SEC) civil charges arising out of the very same conduct, agreeing to pay $15 million in restitution and a civil penalty in the amount of $535 million (*see S.E.C. v Goldman Sachs & Co.*, 790 F Supp 2d 147 [SD NY 2011]).[3] In denying in part codefendant Fabrice Tourre's motion to dismiss the SEC complaint, the Federal District Court held that the complaint sufficiently alleged a material misrepresentation by defendant (i.e., that Paulson was an equity investor), a duty on defendant's part to disclose the truth (i.e., that Paulson was in fact taking a short position), and scienter (*id.* at 162-163).

Plaintiff notes that the United States Permanent Subcommittee on Investigations, following an 18-month investigation, cited defendant as one of the "self-interested promoters of risky and complicated financial schemes that helped trigger the [2008 financial] crisis." With respect to ABACUS, the investment at issue, the Subcommittee concluded that defendant knew that Paulson would "profit only if [ABACUS] lost value," yet allowed Paulson to "play a major role in selecting the assets," while failing to disclose his true "investment objective."

To make a prima facie claim of fraud, a complaint must allege

---

**3.** Although defendant settled the SEC action without admitting or denying the substantive allegations of the complaint, defendant acknowledged that it was a "mistake" not to include in the ABACUS marketing materials a reference to Paulson's role in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.

misrepresentation or concealment of a material fact, falsity, scienter on the part of the wrongdoer, justifiable reliance and resulting injury (*see Dembeck v 220 Cent. Park S., LLC*, 33 AD3d 491, 492 [1st Dept 2006]).

Even in the absence of any affirmative misrepresentation or any fiduciary obligation, a party may be liable for nondisclosure where it has special knowledge or information not attainable by plaintiff, or when it has made a misleading partial disclosure (*see Williams v Sidley Austin Brown & Wood, L.L.P.*, 38 AD3d 219, 220 [1st Dept 2007]; *see also L.K. Sta. Group, LLC v Quantek Media, LLC*, 62 AD3d 487, 493 [1st Dept 2009]).

This appeal turns on whether plaintiff has adequately alleged the element of reasonable reliance. The majority finds that plaintiff cannot establish reasonable reliance as a matter of law because plaintiff allegedly failed to make an inquiry concerning nonpublic information regarding the investment prior to issuing the financial guaranty, and failed to insert an "appropriate prophylactic provision" to protect itself against defendant's deception.

I am compelled to disagree with this line of reasoning. It neither comports with the factual record nor the law on this issue. The offering circular, the document alleged to have triggered plaintiff's duty to inquire, merely states that the hedge fund did not issue equity notes. It does not imply that there was no equity investor or that "no one was investing in the first-loss tranche." It simply lists $50 million in original principal amount for class A-1 notes, $142 million for class A-2 notes, and $0 for "FL" (first loss) notes.

The complaint alleges that long investors can participate in the capital structure of a synthetic CDO such as ABACUS either by purchasing notes or by selling protection on a specified tranche in the capital structure (*see* amended complaint ¶ 18). Given this description, there is a reasonable inference that plaintiff understood the absence of equity notes to mean that Paulson intended to "take a long position in the equity tranche of ABACUS through a [credit default swap]," by selling protection on the 0% to 10% tranche instead of purchasing notes (*see* amended complaint ¶ 60).

Although plaintiff is a sophisticated business entity, based on the unique set of facts presented in this appeal, the duty to perform due diligence was fulfilled, when, as here, plaintiff asked defendant about Paulson's position, defendant made specific and detailed representations that conformed with the industry standard for a similarly situated transaction, and defendant's misrepresentation was not discoverable through

any public source of information. This Court held in *HSH Nordbank AG v UBS AG* (95 AD3d 185 [1st Dept 2012]) that the misrepresentation of risk relating to the notes at issue was discoverable through an exercise of reasonable due diligence within the means of a financial institution of the plaintiff's size and scope, because "the unreliability of credit ratings" was "common knowledge among participants in [the relevant] market" (*id.* at 193). Thus, "[f]ar from being peculiarly within [the defendant's] knowledge, the reliability of the credit ratings could be tested against the public market's valuation of rated securities" (*id.* at 196).

In this matter, defendant concealed the credit default swap whereby Paulson became the undisclosed protection buyer in ABACUS with interests adverse to plaintiff. Far from being "common knowledge," this interest was not discoverable through any publicly available source of information. As such, the allegations presented do not establish that plaintiff failed to exercise reasonable due diligence to protect itself from defendant's misrepresentation.

The majority's reliance on *Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.* (76 AD3d 310 [1st Dept 2010], *affd* 17 NY3d 269 [2011]) to support the proposition that plaintiff failed to exercise due diligence is misplaced. In that action, plaintiffs alleged that they were induced to sell their minority interest in a mobile telephone company based on misrepresentations made by defendants concerning the value of the venture (76 AD3d at 311). This Court held that plaintiffs' claims alleging fraud were barred by the broad general release plaintiffs granted to defendants in connection with the sale of their interest (*id.* at 318-322). Moreover, we held that plaintiffs chose to cash out their interests without insisting on defendants' verification of the value or conditioning the deal on the accuracy of the information, thereby assuming a business risk, especially in light of the adversarial relationship between the parties (*id.* at 320-321).

Here, in contrast, there is no general release or similar agreement at issue. The majority does not rely on general disclaimers to preclude the claims of misrepresentation. Further, the relationship between plaintiff, a monoline bond insurance company (the financial guarantor insurer), and defendant, an investment bank, is not an adversarial one. The investment bank's role is to provide a structure, orchestrate the transaction, and market the CDO to investors. It is important to note that plaintiff alleges that defendant structured this transaction as if it were a typical CDO where the transaction sponsor is a long investor.

While plaintiff did not condition participation based on verification of Goldman's representations, plaintiff did not assume a business risk since the proposed transaction and alleged misrepresentation/concealment conformed to the industry standard for this particular type of transaction. Goldman had peculiar knowledge of Paulson's role in the transaction, and the misrepresentation was not detectable through any public information. Plaintiff sought to protect its interest in the transaction by confirming Paulson's role via email and telephone calls. Thus, given the structure of the transaction and the financial instrument at issue, plaintiff's fraud claim does not fall within the purview of cases holding that such a claim is barred where the parties failed to insert an appropriate prophylactic provision in their agreement stating that their representations were true (*contra Graham Packaging Co., L.P. v Owens-Illinois, Inc.*, 67 AD3d 465 [1st Dept 2009]; *cf. DDJ Mgt., LLC v Rhone Group L.L.C.*, 15 NY3d 147, 153, 156 [2010] [reasonable reliance sufficiently alleged where plaintiff obtained representations and warranties that financial statements were not materially misleading]). **[Prior Case History: 35 Misc 3d 1217(A), 2012 NY Slip Op 50723(U).]**