=================================================================
This memorandum is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 49
ACA Financial Guaranty Corp.,
            Appellant,
        v.
Goldman, Sachs & Co.,
            Respondent,
Paulson & Co., Inc. et al.,
            Defendants.


            Marc E. Kasowitz, for appellant.
            Richard H. Klapper, for respondent.


MEMORANDUM:

            The order of the Appellate Division should be reversed,

with costs, the case remitted to the Appellate Division for

- 1 -

consideration of issues raised but not determined on the appeal to that court and the certified question answered in the negative.

Plaintiff ACA Financial Guaranty Corp. commenced this action against defendant Goldman, Sachs & Co., alleging that defendant fraudulently induced plaintiff to provide financial guaranty for a synthetic collateralized debt obligation (CDO), known as ABACUS. In its complaint, plaintiff alleges that defendant fraudulently concealed the fact that its hedge fund client Paulson & Co., which selected most of the portfolio investment securities in ABACUS, planned to take a "short" position in ABACUS, thereby intentionally exposing plaintiff to substantial liability; had plaintiff known this information, it would not have agreed to the guaranty.

Defendant moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), contending, among other things, that plaintiff failed to sufficiently plead the "justifiable reliance" element of its fraud in the inducement and fraudulent concealment claims. Supreme Court denied the motion, but the Appellate Division reversed the order, granted defendant's motion and dismissed the amended complaint. We now reverse.

To plead a claim for fraud in the inducement or fraudulent concealment, plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentations. It is well established that "if the facts

represented are not matters peculiarly within the [defendant's]
knowledge, and [the plaintiff] has the means available to [it] of
knowing, by the exercise of ordinary intelligence, the truth or
the real quality of the subject of the representation, [the
plaintiff] must make use of those means, or [it] will not be
heard to complain that [it] was induced to enter into the
transaction by misrepresentations" (Schumaker v Mather, 133 NY
590, 596 [1892]; see DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d
147, 154 [2010]).  Moreover, "[w]hen the party to whom a
misrepresentation is made has hints of its falsity, a heightened
degree of diligence is required of it.  It cannot reasonably rely
on such representations without making additional inquiry to
determine their accuracy" (Centro Empresarial Cempresa S.A. v
América Móvil, S.A.B. de C.V., 17 NY3d 269, 279 [2011], quoting
Global Mins. & Metals Corp. v Holme (35 AD3d 93, 100 [1st Dept
2006], lv denied 8 NY3d 804 [2007]).  Nevertheless, the question
of what constitutes reasonable reliance is not generally a
question to be resolved as a matter of law on a motion to dismiss
(DDJ Mgt., LLC, 15 NY3d at 156).

In its complaint, plaintiff alleges that it sought
assurances from defendant about Paulson's role in ABACUS.
Specifically, plaintiff alleges that it e-mailed defendant asking
how Paulson intended to "participate" in the transaction.
Plaintiff further alleges that defendant affirmatively
misrepresented to plaintiff that Paulson would be the equity

investor in ABACUS.  Thus, at this pleading stage, plaintiff has sufficiently alleged justifiable reliance.

Contrary to defendant's claim, our holding in Centro Empresarial Cempresa S.A. (17 NY3d 269) does not impose a duty on plaintiffs to insist on a "prophylactic provision" in agreements.  Centro involved a release that accompanied a multi-million-dollar purchase agreement (see id. at 274).  The plaintiffs in Centro "knew that defendants had not supplied them with the financial information to which they were entitled, triggering 'a heightened degree of diligence'" (Pappas v Tzolis, 20 NY3d 228, 232-233 [2012], quoting Centro Empresarial Cempresa S.A. 17 NY3d at 279).  Despite this knowledge, the plaintiffs in Centro neither insisted on a prophylactic provision nor exercised due diligence by seeking the information to which they were entitled.  Unlike in Centro, plaintiff here claims that defendant knew that Paulson was taking a position contrary to plaintiff's interest, but withheld that information, despite plaintiff's inquiries.  Further, unlike the release in Centro, there was no written agreement between plaintiff and defendant in which a "prophylatic provision" could have been inserted.

Accepting the allegations of the complaint as true and providing plaintiff the benefit of every possible favorable inference as we must do on a motion to dismiss (see AG Capital Funding Partners, L.P. v State St. Bank & Trust Co., 5 NY3d 582, 591 [2005]), plaintiff has sufficiently pleaded justifiable

reliance for the causes of action for fraud in the inducement and
fraudulent concealment.  Additionally, defendant failed to submit
documentary evidence that conclusively established the lack of
justifiable reliance (see CPLR 3211 [a] [1]).

ACA Financial v Goldman Sachs

No. 49

READ, J. (DISSENTING):

In early 2007, Goldman, Sachs & Co. (Goldman) structured and marketed a synthetic collateralized debt obligation (CDO) called ABACUS 2007-AC1 (ABACUS). This product was tied to the performance of a reference portfolio of subprime residential mortgage-backed securities, which are pools of home loans that have been securitized. Synthetic CDOs are typically divided into tranches based on the level of credit risk. Notes in the most senior tranche have the lowest risk of non-payment due to defaults in the underlying collateral (here, the mortgages) and therefore bear the lowest interest rate. Conversely, notes in the most junior or "first loss" tranche of the synthetic CDO's capital structure are the first to experience losses from defaults, and therefore have the highest potential rate of return.

Goldman put ABACUS together at the behest of its hedge fund client, Paulson & Co. (Paulson). ACA Management, a wholly owned subsidiary of ACA Financial Management Guaranty Corp., a bond insurer (collectively, ACA), participated in ABACUS as the third-party portfolio selection agent responsible for choosing the portfolio of reference obligations. Working with Paulson,

ACA selected a portfolio of 90 subprime residential mortgage-backed securities that met the transaction's eligibility criteria; i.e., they were issued in 2006 and early 2007 and rated Baa2 by Moody's Investors Service. Paulson allegedly originally proposed 49 of the 90 securities ultimately selected by ACA for ABACUS. ACA unconditionally guaranteed payment for up to $909 million, which referenced the most senior tranche of ABACUS notes.

After the housing market collapsed and ABACUS failed, ACA sued Goldman for common law fraudulent inducement and fraudulent concealment. ACA alleges that Goldman misrepresented that Paulson had "pre-committed to take a long position in ABACUS" even though Goldman knew all along that Paulson was, in fact, "the sole short investor." ACA claims it never would have insured ABACUS notes if it had known that Paulson had an economic incentive to select reference obligations that would fail.

The outcome of this appeal turns entirely on whether ACA has adequately pleaded the element of "justifiable reliance" necessary to sustain its fraud claims against Goldman. The majority concludes that ACA has done so, pointing to allegations that ACA "e-mailed [Goldman] asking how Paulson intended to 'participate' in the transaction," and that Goldman "affirmatively misrepresented to [ACA] that Paulson would be the equity investor in ABACUS" (majority op at 3). But it is not enough for a sophisticated party like ACA to plead that it relied

on Goldman's alleged misrepresentations; to state a cause of action for fraud, that reliance must have been justifiable, meaning that ACA must allege the "reasonable steps" that it took "to protect itself against deception" (DDJ Mgt., LLC v Rhone Group L.L.C, 15 NY3d 147, 154 [2010]).  Here, ACA manifestly took no steps to safeguard its interests.  And there was an obvious and easy step that ACA might have taken; ACA might have simply asked Paulson directly what its investment position was in ABACUS.

> We first articulated our rule over a century ago:
>
> > "[I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations" (Schumaker v Mather, 133 NY 590, 596 [1892] [emphasis added]).

This rule has been "frequently applied in recent years where the plaintiff is a sophisticated business person or entity that claims to have been taken in" (DDJ Mgt., 15 NY3d at 154).  Thus, where a plaintiff alleges that it has taken an arguably adequate reasonable step to protect itself against the fraud complained of, we have held that it was for the trier of fact to determine if the plaintiff's reliance was justifiable.  Conversely, where a plaintiff has neglected to take and allege a reasonable protective step, we have held that the complaint failed, as a matter of law, to plead justifiable reliance.

DDJ Mgt. is an example of the first kind of case. There, the plaintiffs were four companies that loaned $40 million to American Remanufacturers Holdings, Inc. (ARI or the company), a re-manufacturer of automobile parts.  When ARI failed to repay the loans, the plaintiffs sued the company's stock owners, their corporate affiliates and individuals acting on their behalf (collectively, the stock owners), accusing them of "defraud[ing the] plaintiffs into making the loans" (id. at 151).  In particular, the plaintiffs alleged that the stock owners presented them with false and misleading financial statements that were designed to inflate ARI's earnings.

We assumed for purposes of the appeal that the complaint "adequately allege[d] that [the stock owners] made material misrepresentations," which meant that "[t]he [only] question . . . [was] whether, if the complaint's allegations are true, a jury could find that [the] plaintiffs justifiably relied on those misrepresentations" (id. at 152).  The stock owners argued there could be no justifiable reliance because the plaintiffs did not make a reasonable inquiry into the truth of their representations.

The financial documents that the company provided the plaintiffs "contained some features that might have aroused concern in a skeptical reader who examined them carefully," and the plaintiffs did not ask questions about these aspects of the financial statements or look at ARI's records.  Yet, the

plaintiffs "insist[ed] that ARI represent and warrant, in substance, that the financial statements were accurate" as a condition of closing (id. at 153).

We concluded that, on these facts, "[the] plaintiffs made a significant effort to protect themselves against the possibility of false financial statements: they obtained representations and warranties to the effect that nothing in the financials was materially misleading" (id. at 156); and that "where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry" (id. at 155). Accordingly, we held that the plaintiffs had adequately alleged justifiable reliance, and "whether they were justified in relying on the warranties they received is a question to be resolved by the trier of fact" (id. at 156).

Centro Empresarial Compresa S.A. (17 NY3d 269 [2011]) is an example of the second kind of case -- where the complaint fails as a matter of law because a plaintiff has neglected to allege that it took reasonable steps to protect itself against fraud. There, the plaintiffs, allegedly relying on false financial information supplied by the defendants, agreed to sell business units to the defendants at a set "floor price." Although they were entitled to the financial information necessary to value these business units properly, the plaintiffs

neither demanded access to it nor sought assurances as to its accuracy in the form of representations and warranties, which we had recently explicitly held in DDJ Mgt. might substitute for investigating the facts represented.  The plaintiffs' failure to take these obvious "reasonable steps to protect [themselves] against deception" (DDJ Mgt., 15 NY3d at 154) proved fatal to their fraud claim.

The majority treats representations and warranties as unworthy of serious consideration here because, "there was no written agreement between [ACA] and [Goldman] in which a 'prophylactic provision' could have been inserted" (majority op at 4).  But if assurance that Paulson was taking a net long position in ABACUS was as critical to ACA's commercial decisonmaking as it now claims, ACA surely could have and would have conditioned its financial guaranty on Goldman (or Paulson, for that matter) entering into an agreement containing written representations and covenants.  And in any event, Goldman points out, the guaranty was effectuated and governed by eight separate agreements involving ACA, Goldman and the bank that intermediated the transaction, and "ACA's contracts with [the bank], and [the bank's] corresponding contracts with [Goldman], could all have included prophylactic provisions concerning Paulson's investment position, if that were important to ACA at the time."

The federal courts, applying our New York rule, have likewise determined justifiable reliance to be lacking in

situations where a plaintiff does not bother to consult a source
of information that might have revealed the alleged fraud.
Lazard Freres & Co. v Protective Life Ins. Co. (108 F3d 1531 [2d
Cir 1997]) involved an attempted sale of millions of dollars in
bank debt between two large and sophisticated companies.  The
seller allegedly made false statements with respect to the
content of a certain report on the debtor's financial condition,
and because the deal was time-sensitive, the buyer made an oral
commitment to purchase before reviewing the report.  One of the
questions on appeal was whether the buyer reasonably relied on
the seller's representations of the contents of the report.  The
Second Circuit opined that the buyer should have, and easily
could have, protected itself from misrepresentation by demanding
to see the report as a condition of closing (id. at 1543).

In discussing the law, the court observed that "[i]t is
well established that 'where sophisticated businessmen engaged in
major transactions enjoy access to critical information but fail
to take advantage of that access, New York courts are
particularly disinclined to entertain claims of justifiable
reliance'" (id. at 1541, quoting Grumman Allied Ind., Inc. v Rohr
Ind., Inc., 748 F2d 729, 737 [2d Cir 1984]).  The Second Circuit
went on to note that this was especially true in "situations in
which the relevant facts were easily accessible to the relying
party," citing instances where the plaintiffs could have "made
simple inquiries" or "examine[d] the corporate records before

assuming the obligations" (id. at 1542 [internal quotation marks omitted]).

In Grumman, the plaintiff alleged misrepresentations and failure to disclose material facts relating to the testing of buses. Although the plaintiff "enjoyed unfettered access to [the defendant]'s plants, personnel and documents; and . . . possessed the legal, technical and business expertise necessary to make effective use of that access," it "neither inquired into the results of [the defendant's] testing, nor asked to scrutinize testing reports" (748 F2d at 737, 738). The Second Circuit therefore rejected the plaintiff's fraud claim based on "the unambiguous case law and the undisputed facts" (id.). In doing so, the court acknowledged the general "principle that access bars claims of reliance on misrepresentations" (id. at 737 [emphasis added]), and cited cases where experienced businessmen were barred from claiming fraud when they relied solely on verbal assurances despite "undisputed access to corporate records" (id. at 730).

Here, ACA alleges that, after its first meeting with Paulson on January 8, 2007, it was unsure how Paulson meant to "participate" in the transaction.* But unlike outside investors

---

*ACA's complaint quotes the following email sent to a Goldman employee involved in the transaction by an ACA participant in ACA's initial meeting with Paulson: "I have no idea how it went -- I wouldn't say it went poorly, not at all, but I think it didn't help that we didn't know exactly how [Paulson] want[s] to participate in the space. Can you get us

in ABACUS, who had no way to know that Paulson was involved in the transaction in any way, ACA was on the inside.  ACA and Paulson worked together for a month to assemble the 90 subprime residential mortgage-backed securities in the reference portfolio.  Further, ACA's Senior Credit Committee did not give conditional approval of the financial guaranty until March 31, 2007, and the guarentee was not consummated until May 31, 2007.  Yet, during that five-month stretch of unfettered access to Paulson, ACA never once asked Paulson about its investment position in ABACUS.  ACA easily could have done so, and, optimally, would have demanded a written representation from Goldman and/or Paulson before issuing the financial guaranty essential to the transaction.  Instead, like the plaintiffs in Centro, Lazard Freres and Grumman, ACA merely relied on what it says Goldman told it without actually checking the source (i.e., asking Paulson), or taking any other "reasonable steps to protect itself against deception" (DDJ Mgt., 15 NY3d at 154).

ACA, a sophisticated financial entity, protests that it was not reasonable to query Paulson about its investment position in ABACUS because Paulson most likely would have lied, and, in any event, whether Paulson would have disclosed the truth is a factual issue that cannot be resolved on a motion to dismiss. But whether Paulson would have lied or not is irrelevant.  The representations and warranties obtained by the plaintiffs in DDJ

---

some feedback?"

Mgt. were, after all, allegedly false.  What matters is that the plaintiffs there took the arguably adequate reasonable step of requesting and obtaining representations and warranties to protect themselves against potential fraud.  The DDJ Mgt. plaintiffs -- unlike ACA -- therefore were able to allege facts from which a trier of fact might find justifiable reliance.

Savvy commercial and financial players and inventive lawyers abound in New York.  Our venerable rule requiring that the reliance necessary to establish fraud must be justifiable is designed to make sure that the courts "reject[] the claims of plaintiffs who have been so lax in protecting themselves that they cannot fairly ask for the law's protection" and "may truly be said to have willingly assumed the business risk that the facts may not be as represented" (DDJ Mgt., 15 NY3d at 154 [internal quotation marks omitted]).  Because ACA cannot, as a matter of law, establish justifiable reliance on the basis of the facts alleged in its amended complaint, I respectfully dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, with costs, case remitted to the Appellate Division, First Department, for consideration of issues raised but not determined on the appeal to that court and certified question answered in the negative, in a memorandum.  Chief Judge Lippman and Judges Pigott, Rivera, Stein and Fahey concur.  Judge Read dissents in an opinion in which Judge Abdus-Salaam concurs.

Decided May 7, 2015