CORAUD LLC, Plaintiff,

v.

KIDVILLE FRANCHISE COMPANY, LLC, Andrew Stenzler, Harry R. Harwood, Jr., Ash Robinson, and Joseph Sexton, Defendants.

No. 14–cv–9105 (JSR).

United States District Court, S.D. New York.

Signed June 12, 2015.

William Michael Garner, Garner & Ginsburg, PA, Minneapolis, MN, for Plaintiff.

Kevin Michael Shelley, Kaufmann Gildin & Robbins LLP, New York, NY, for Defendants.

### *MEMORANDUM*

JED S. RAKOFF, District Judge.

This action arises out of plaintiff Coraud LLC's ("Coraud's") 2012 purchase of a franchise for a childcare center from defendant Kidville Franchise Co. ("Kidville"). After Coraud allegedly sustained losses in its first two years operating the franchise, it brought this action against Kidville and individual defendants Andrew Stenzler, Harry R. Harwood, Jr., Ash Robinson, and Joseph Sexton, alleging common law claims and violations of the New York State Franchise Sales Act ("NYFSA") and New Jersey Franchise Practices Act ("NJFPA"). On January 9, 2015, defendants moved to dismiss certain of Coraud's claims against Kidville and to dismiss the individual defendants from the action entirely. In a March 2, 2015 Order, the Court granted the motion in part and denied it in part. Specifically, the Court granted defendants' motion to dismiss with respect to Coraud's common law fraud and negligent misrepresentation claims, Co-

raud's claims against defendants Harwood and Robinson under the NYSFA, Coraud's claim against Kidville under the NJFPA, and Coraud's demands for a jury trial and for punitive and exemplary damages; and the Court denied defendants' motion with respect to Coraud's claims against Kidville, Sexton, and Stenzler under the NYSFA and Coraud's demand for consequential damages. This Memorandum explains the reasons for those rulings.

The following allegations, which the Court accepts as true for purposes of this motion only, are taken from the Complaint. Kidville operates and franchises facilities used for the "care and development" of young children. Complaint ¶¶ 11, 24. In August 2011, husband and wife Paul and Catharine Wilder, the founders of plaintiff Coraud, contacted Kidville about becoming a franchisee. *Id.* ¶ 15. This was the first of a series of conversations and meetings with Kidville employees leading up to Coraud's eventual purchase of a franchise in April 2012. *Id.* ¶ 25.

The Wilders' primary contact at Kidville was defendant Joe Sexton, Kidville's Senior Manager of Franchise Development. *Id.* ¶ 10. Sexton worked with the Wilders to develop a "business model" in advance of their purchase of a franchise. *Id.* ¶ 16. The "model" was effectively a profit and loss spreadsheet that included inputs for revenue—such as "payment for classes, income from birthday parties, and income from special events"—and inputs for expenses—such as "contract labor, advertising and promotion, and operating supplies." *Id.* The Wilders, who had no experience with the type of calculations the business model required, "were completely dependent on Sexton and Kidville in completing the" spreadsheet and informed Sexton that they needed his help. *Id.* The Wilders then worked with Sexton

on the model over a number of weeks, *see id.* ¶¶ 20–22, 23, ending up with a final version that calculated first-year revenues of $600,000 and a net income of $43,901. *Id.* ¶ 23. Sexton told the Wilders that the expense inputs they used in the business model were accurate and that the revenue inputs were "in the ball park" and "on track." *Id.* ¶¶ 21, 23.

Additionally, Sexton provided the Wilders with market and demographic analyses for territories in New Jersey, where the Wilders had expressed interest in opening their franchise. *Id.* ¶ 16. Among the markets discussed was the suburban town of Westfield, New Jersey, which the Wilders had identified as a preferred market and which Sexton described as one of the "top ten locations." *Id.* ¶ 19. After receiving additional information from Sexton about Westfield, as well as other locations, the Wilders settled on Westfield to open their franchise. *Id.* ¶¶ 19, 26.

In February 2012, Kidville provided the Wilders with a revised copy of its Franchise Disclosure Document (the "FDD"), a prospectus that a franchisor is required by law to provide to potential franchisees. *Id.* ¶¶ 17, 24. Among other information, the FDD stated that the cost of opening an "annex facility," the type of franchise that the Wilders eventually opened, was $259,405 to $417,750 (exclusive of certain specified costs). *Id.* ¶ 24. In addition, the FDD contained "statistics on the status of the franchise system," but failed to include any mention of Kidville's affiliate, J.W. Tumbles, which franchised children's gyms and had had certain outlets shut down in the previous years. *Id.*

On the basis of the above-mentioned representations as well as others not pertinent here, the Wilders formed Coraud LLC and, through it, signed a franchise agreement in April 2012. *Id.* ¶ 25; Declaration of Kevin M. Shelley ("Shelley

Decl."), Ex. E (the "Franchise Agreement"). The Wilders soon learned, however, that many of the representations were inaccurate. *Id.* ¶ 26. For example, with respect to expenses, the cost of "building out the franchised premises" was over $680,000, or 63 percent higher than the "top end" estimate of $417,750 in the FDD. *Id.* ¶ 26(a). Likewise and with respect to income, although "Sexton and Kidville approved the Wilders' projections of revenues in the range of $600,000 for the first year and profits of nearly $44,000," revenues for the first year were limited to $202,000, leaving the Wilders a loss of $168,000. *Id.* 26(b). Additionally, Sexton and Kidville had made these various representations without alerting the Wilders to the fact that Kidville "had no experience with suburban locations"—where the Wilders chose to open their franchise, *id.* ¶ 26—or that J.W. Tumbles had "adverse" results operating in suburban areas. *Id.* ¶¶ 22, 26(c). Coraud's franchise continued to incur losses in its second year of operation, *Id.* ¶ 26(b), and Coraud filed this suit in November 2014.

In the motion now at issue, defendants request that the Court (1) dismiss Coraud's common law fraud and negligent misrepresentation claims; (2) dismiss Coraud's claims brought against Kidville pursuant to Section 687 of the NYFSA; (3) dismiss Coraud's NYFSA claims brought against the individual defendants; (4) dismiss Coraud's NJFPA claims against Kidville; (5) strike Coraud's jury demand; and (6) strike Coraud's demand for punitive, exemplary, and consequential damages. The Court addresses each in turn.

■ Under New York law,[1] to prevail on a claim of common law fraud or com-

mon law negligent misrepresentation, a plaintiff must show, among other things, "reasonable reliance" on the alleged misstatements or omissions. *See J.A.O. Acquisition Corp. v. Stavitsky,* 8 N.Y.3d 144, 148, 831 N.Y.S.2d 364, 863 N.E.2d 585 (2007) (listing the elements of a negligent misrepresentation claim); *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996) (listing the elements of a fraud claim). Thus, as a general rule, where a contract contains a disclaimer of reliance on certain representations, a "party cannot, in a subsequent action ... claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon," *Harsco Corp. v. Segui,* 91 F.3d 337, 345 (2d Cir.1996), so long as "(1) the disclaimer is made sufficiently specific to the particular type of fact misrepresented or undisclosed; and (2) the alleged misrepresentations or omissions did not concern facts peculiarly within the seller's knowledge." *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.,* 115 A.D.3d 128, 980 N.Y.S.2d 21, 28 (1st Dep't 2014).

■ Here, defendants assert that Coraud cannot prevail on its common law claims because Coraud, when it signed the Franchise Agreement, expressly disclaimed any reliance on statements made outside of the FDD. The Court agrees.

The Franchise Agreement includes, among others, the following disclaimer:

> That except as may be provided in our [Kidville's] Franchise Disclosure Document you [Coraud] have not received from us, and are not relying upon, any representations or guarantees, express

---

1. The parties analyze both New York law and New Jersey law in their briefs, but neither party asserts that a relevant conflict between the two bodies of law exists. Accordingly, the

Court applies New York law. *See Matter of Allstate Ins. Co. (Stolarz),* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993).

or implied, as to the potential volume, sales, income, or profits of a KIDVILLE Facility, that any information you have acquired from other KIDVILLE Facility franchisees regarding their sales, income, profits, or cash flows was not information obtained from us, and that we make no representation about that information's accuracy.

Franchise Agreement at 2. Because this disclaimer covers "the very matter"—potential volume, sales, income, and profits— "as to which [Coraud] now claims it was defrauded," the disclaimer is "sufficiently specific" to bar Coraud's claim of reliance. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959). Further, Coraud has not alleged that any of the alleged misrepresentations outside of the FDD concerned matters solely within defendants' knowledge; if the cost of opening a franchise, the expected revenue, and the desirability of the location Coraud chose could not have been discovered with the exercise of due diligence, Coraud has failed to allege it. *Cf. Goldman Sachs Grp., Inc.,* 980 N.Y.S.2d at 30 (allegations that defendant had "access to *nonpublic* information regarding the deteriorating credit quality of subprime mortgages" satisfies "the peculiar knowledge exception to the disclaimer bar") (emphasis added). Accordingly, Coraud's common law claims must be dismissed.[2]

■ The Court arrives at a different result with respect to Coraud's fraud claim

brought pursuant to the NYSFA. Section 687 of the NYFSA makes it unlawful for any person, "in connection with the offer, sale or purchase of any franchise," to "[m]ake any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." N.Y. Gen. Bus. Law § 687(2)(b). "[R]eliance is an element of a fraud claim under the Franchise Act" as well, *see Emfore Corp. v. Blimpie Associates, Ltd.,* 51 A.D.3d 434, 860 N.Y.S.2d 12, 14 (1st Dep't 2008), and defendants, therefore, advance the same disclaimer-based argument here as they did in moving to dismiss Coraud's common law claims.

The disclaimers, however, cannot bar a fraud action under Section 687. Anti-waiver provisions contained within Section 687 provide that "[a]ny condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void" and make it unlawful "to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article." N.Y. Gen. Bus. Law §§ 687(4)-(5). In *Emfore Corp. v. Blimpie Associates, Ltd.,* the First Department held that these provisions prohibit treating a contractual disclaimer "as a waiver of fraud claims."[3] 51 A.D.3d 434, 860 N.Y.S.2d 12, 14 (1st Dep't 2008); *see also, e.g., Solanki v. 7–Eleven, Inc.,* 2014

---

2. Following the issuance of the Court's March 2, 2015 Order, Coraud filed an amended complaint that alleges common law fraud and negligent misrepresentation based on reliance on misstatements and omissions contained *within* the FDD, which, unlike reliance on the alleged misrepresentations discussed above, is not barred by the contractual disclaimers. This Memorandum does not address the merits of Coraud's amended claims.

3. The disclaimer in *Emfore* required the franchisee to list any representations outside of the franchise disclosure document on which the franchisee relied. Coraud, in addition to the disclaimer quoted above, was also presented with a similar disclaimer. *See* Shelley Decl., Ex. C, ¶ 8.

WL 320236, at *5 (S.D.N.Y. Jan. 29, 2014) ("[A]ny disclaimers reviewed, acknowledged or signed by Solanki cannot bar his claims under the [NYSFA].") (citing *Emfore*, 860 N.Y.S.2d at 14). A straightforward application of *Emfore* requires the Court to deny the motion to dismiss.

In an attempt to avoid this result, defendants ask the Court to disregard *Emfore* and apply *Governara v. 7-Eleven, Inc.*, 2014 WL 4476534 (S.D.N.Y. Aug. 20, 2014), instead. The court in *Governara*, presented with facts materially the same as those here and as in *Emfore*, criticized *Emfore* as erroneously relying on a case that held only that anti-waiver provisions void the waiver of *explicit* statutory rights. *Id.* at *6 (discussing *Draper v. Georgia Properties, Inc.*, 230 A.D.2d 455, 660 N.Y.S.2d 556 (1st Dep't 1997)). "Because the [NYSFA] does not give franchisees the statutory right to purchase a franchise *while relying on verbal representations outside of a written contract*," the court reasoned that a franchise agreement's "non-reliance disclaimer is not proscribed *per se* by the [NYSFA]." *Id.* (emphasis in original). Having dismissed the applicability of the anti-waiver provisions, the *Governara* court then dismissed the franchisee's Section 687 claim as barred by a contractual disclaimer. *Id.* at *7.

This Court declines to follow *Governara's* lead. Section 687(4) of the NYSFA does not, on its face, prohibit the waiver of any "rights" created by the NYSFA; thus, the fact that the NYSFA does not create a right to "rely[ ] on verbal representations outside of a written contract" is not dispositive. What Section 687(4) does do, though, is prohibit waivers of "compliance with any provision" of the NYSFA, and Section 687(2), one such provision, makes it "unlawful for a person, in connection with the offer, sale or purchase of any franchise," to make a fraudulent statement. Thus, the disclaimer, if given effect in the manner defendants here request and that *Governara* allowed, accomplishes what Section 687(4) aims to prevent, namely, freedom from compliance with the NYSFA's anti-fraud provision.[4]

Moreover, "[t]he holding of an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 399 (2d Cir.2001) (internal quotation marks omitted). Here, *Governara* aside, the "data points"—which may "include relevant case law from other jurisdictions on the same or analogous issues, scholarly writings in the field, and any other resources available to the state's highest court," *id.* (internal quotation marks omitted)—convince the Court that *Emfore* is correct.

As the language of the NYSFA reveals, the statute was modeled after the federal securities laws, which have an anti-waiver provision of their own. Section 29(a) of the Exchange Act provides, "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a).[5] The First Circuit, in

---

4. For similar reasons, the disclaimer operates as a prohibited "waiver ... which would relieve a person from any duty or liability imposed by this article." N.Y. Gen. Bus. Law § 687(5).

5. While the Court recognizes that comparisons of the NYSFA to the federal securities laws are inapt when the two laws use materially different language, *see A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 87 N.Y.2d 574, 583, 640 N.Y.S.2d 849,

considering the effect of this language on a disclaimer of reliance, offered the following analysis:

> A separate comment should be directed to the contractual acknowledgement of non-reliance.... This is not, in its terms, a 'condition, stipulation, or provision binding (plaintiff) to waive compliance' with the Securities Act of 1934, as set forth in Section 29(a) of the Act, (15 U.S.C. § 78cc(a)). But, on analysis, we see no fundamental difference between saying, for example, 'I waive any rights I might have because of your representations or obligations to make full disclosure' and 'I am not relying on your representations or obligations to make full disclosure.' Were we to hold that the existence of this provision constituted the basis (or a substantial part of the basis) for finding non-reliance as a matter of law, we would have gone far toward eviscerating Section 29(a).

*Rogen v. Ilikon Corp.*, 361 F.2d 260, 268 (1st Cir.1966). The Court finds the First Circuit's reasoning equally applicable here. Just as Section 29(a) "forecloses anticipatory waivers of compliance with the duties imposed by Rule 10b–5," *see AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 180 (3d Cir.2003) (adopting *Rogen's* holding), so too Section 687(4) bars anticipatory waivers of compliance with the NYSFA's anti-fraud provisions.[6]

Furthermore, the policies underlying the NYSFA confirm this interpretation. The formal legislative findings made part of the NYSFA declare that the statute was enacted in response to "New York residents hav[ing] suffered substantial losses where the franchisor or his representative has not provided full and complete information," and the "intent" of the statute was therefore "to prohibit the sale of franchises where such sale would lead to fraud." N.Y. Gen. Bus. Law § 680. These findings reflect "the reality that, in the franchise context, written contractual provisions are not as likely to be scrutinized by less sophisticated people, whose judgment may be compromised in the face of aggressive salesmanship." *EV Scarsdale Corp. v. Engel & Voelkers N.E. LLC*, 13 N.Y.S.3d 805, 818, 2015 WL 3549361, at *10 (N.Y.Sup.Ct.2015). In light of all this and the fact that the provisions of the NYSFA are required to "be liberally construed to effect the purposes thereof," N.Y. Gen. Bus. Law § 695(2), the Court concludes, consistent with *Emfore* and with the purposes underlying the NYSFA, that Section 687(4) prohibits applying a contractual disclaimer "as a waiver of fraud claims." *Emfore*, 860 N.Y.S.2d at 14.[7]

▮ The Court now turns to Coraud's NYSFA claims against the individual defendants. Section 691(3) of the NYSFA imposes joint and several liability on a control person of a franchisor or an em-

---

663 N.E.2d 890 (1996), the Court finds the difference between Section 29(a) and Section 687(4) to be insignificant.

**6.** The Second Circuit, in contrast, has declined to follow *Rogen*, but it distinguished the First Circuit's decision on two grounds. First, that the facts in *Rogen* presented a case of "disparity in bargaining power between the plaintiff ... and the defendant corporation," *Harsco Corp.*, 91 F.3d at 344, and second that the plaintiff in *Rogen* disclaimed all reliance, not just (as here and as in *Harsco Corp.*) reliance on extra-contractual representations,

*see id.* The first of these distinctions strongly suggests that the Second Circuit might reach a different result in the circumstances that the NYSFA, generally, was enacted to govern.

**7.** The Court does not reach, at least at this juncture, whether it is appropriate to consider the contractual disclaimer at all when assessing the reasonableness of Coraud's alleged reliance. *See AES Corp.*, 325 F.3d at 184 (Clifford, J., concurring in part and dissenting in part).

ployee thereof "who materially aids in the act o[r] transaction constituting the violation." *See A.J. Temple,* 87 N.Y.2d at 580, 640 N.Y.S.2d 849, 663 N.E.2d 890. While the New York courts do not appear to have articulated a formal standard regarding what constitutes "material aid," the New York Court of Appeals has nonetheless provided some guidance. In *A.J. Temple Marble & Tile v. Union Carbide Marble Care,* that court found that one defendant materially aided a violation where he (1) developed a concealed business plan that imposed limits on the franchisor's investments in the franchisees' operations; (2) "directly participated in the unlawful franchise sales"; and (3) "was responsible for misrepresentations in the solicitation materials." 87 N.Y.2d 574, 584, 640 N.Y.S.2d 849, 663 N.E.2d 890 (1996). In contrast, the court found that another defendant did not offer "material aid" where he approved of the same business plan, as "it [wa]s not the business plan itself that [wa]s alleged to be in violation of the statute, but defendants' concealment of that plan in promoting the franchise." *Id.; see also Vysovsky v. Glassman,* 2007 WL 3130562, at *19 (S.D.N.Y. Oct. 23, 2007) *vacated on other grounds and remanded sub nom. Kroshnyi v. U.S. Pack Courier Servs., Inc.,* 771 F.3d 93 (2d Cir.2014) ("active participation" in relevant meetings and "ultimate authority over the conduct constituting the alleged violations" constitutes "material aid").

█ Drawing on these examples, the Court denies the motion to dismiss with respect to defendants Sexton and Stenzler. The complaint is replete with allegations regarding Sexton's persistence in recruiting the Wilders as well as his use of allegedly inaccurate representations in the business model on which the Wilders relied and with respect to the suitability of the location the Wilders chose for their

franchise. *See* Complaint ¶¶ 16–17, 19. Stenzler, for his part, is alleged to have approved of the contents of the FDD as well as sworn to the truth of the representations therein. *Id.* ¶ 7. Given that the alleged misrepresentations and omissions in the FDD are central to both Coraud's fraud claims under Section 687 of the NYSFA and its claims under Section 683 of the NYSFA, which requires disclosure of certain specified information in the FDD, these allegations are sufficient to survive dismissal at the motion to dismiss stage. *Cf. A.J. Temple,* 87 N.Y.2d at 584, 640 N.Y.S.2d 849, 663 N.E.2d 890.

█ In contrast, the allegations with respect to defendants Harwood and Robinson are too thin to withstand defendants' motion. According to the complaint, Harwood and Robinson generally encouraged the Wilders to purchase a franchise at a franchisee recruitment event, approved unspecified sales materials, and had a hand in drafting and signing the franchise agreement. Complaint ¶¶ 8–9. Robinson is also alleged to have sent a general brochure with cost estimates after the Wilders first expressed interest in becoming franchisees in August 2011. *Id.* ¶ 15. While the drafting or signing of a document containing misrepresentations on which the franchisee relies may be sufficient, the Franchise Agreement, unlike the FDD, is not alleged to contain such misrepresentations. As for the brochure that Robinson sent, it predated the additional materials—namely, the business model and the FDD—some of which were tailored to the Wilders and on which they allegedly relied. In sum, the Court finds the type of general, run-of-the-mill interaction with a potential franchisee that Harwood and Robinson are alleged to have had is insufficient to constitute "material aid."

█ As noted above, in addition to its common law and NYSFA claims, Coraud

invokes the NJFPA to bring a claim for "*de facto* or constructive termination." Complaint ¶ 53. The NJFPA applies only to certain motor vehicle franchises and "to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise." N.J. Stat. § 56:10–4(a). There is no dispute that the Complaint is devoid of any allegations concerning sales between Coraud and Kidville, let alone sales in the amount of $35,000. Coraud contends, however, that the $35,000 threshold requirement concerns sales to the public (which Coraud has alleged), not sales between the franchisor and franchisee.

Coraud's argument is in clear tension with the plain text of the statute. The second prong of these threshold requirements makes an explicit reference to sales "between the franchisor and franchisee"; the third prong, in contrast, does not. Despite this different language, Coraud would read the two provisions to mean essentially the same thing, with the only difference being that 20% is replaced with $35,000.

■■■ "If the language is clear," courts must "interpret the statute consistent with its plain meaning," *Oberhand v. Dir., Div. of Taxation*, 193 N.J. 558, 568, 940 A.2d

1202 (2008), and here, the language is unambiguous: it requires sales "between franchisor and franchisee." *Cf. Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 172–73, 178, 495 A.2d 66 (1985) (noting that it was "undisputed that the[ ] parties do not meet the $35,000 threshold" even though the franchisee had sales in excess of $63,000 in the 18–month period before the lawsuit); *Boyle v. Vanguard Car Rental USA, Inc.*, 2009 WL 3208310, at *5 (D.N.J. Sept. 30, 2009) ("[T]he $35,000 requirement singles out for protection those franchises that are especially vulnerable to the disproportionate power of franchisors.").[8] Coraud, moreover, offers no explanation of how to reconcile its proposed interpretation with the statute's text. Accordingly, because Coraud has failed to allege facts that meet this threshold requirement, its constructive termination claim under the NJFPA must be dismissed.

Finally, defendants, relying on two waivers in the Franchise Agreement, have moved to strike Coraud's demand for a jury trial and for punitive, exemplary, and consequential damages. Under the first waiver, the parties agreed to "irrevocably waive trial by jury." Franchise Agreement at 60. Under the second, the parties agreed not to seek "exemplary, punitive, treble and other forms of multiple damages" and to limit any disputes to "actual damages." *Id.* The plain language of these waivers requires dismissal of the jury demand and the demand for punitive and exemplary damages. Equally true, however, is that Coraud may continue to seek

---

8. Coraud observes that some courts have focused on sales to the public. *See, e.g., Beilowitz v. Gen. Motors Corp.*, 233 F.Supp.2d 631, 640 (D.N.J.2002). *But see, e.g., Gen. Motors Corp. v. Gallo GMC Truck Sales, Inc.*, 711 F.Supp. 810, 815 (D.N.J.1989) (Rodriguez, J.) ("[G]ross sales of heavy duty truck products

*between* GMC and Gallo for the 12–month period preceding Gallo's counterclaim totalled approximately $2,022,821.00, exceeding the $35,000.00 required by the Act.") (emphasis added). None of the cases Coraud cites, however, addressed the question of statutory interpretation presented here.

consequential damages, which are a form of compensatory, or "actual," damages, *see Bi–Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 193, 856 N.Y.S.2d 505, 886 N.E.2d 127 (2008), that the Franchise Agreement permits Coraud to pursue.

 In an effort to save its demand for a jury trial and for punitive damages, Coraud makes two arguments, neither of which persuades the Court. First, Coraud asserts that defendants waived the contractual jury waiver when they submitted, together with Coraud, a joint proposed case management plan that designated this case as one to be tried by a jury. Contractual rights, however, will be deemed waived only "if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 817 N.Y.S.2d 606, 850 N.E.2d 653 (2006). Here, defendants sought leave to file this motion before the parties submitted the joint proposed case management plan, which undermines Coraud's assertion that the submission "manifest[ed] ... intent to relinquish a contractual protection." *Id.* (internal quotation marks omitted). Moreover, finding abandonment of a contractual jury waiver is inappropriate where, as here, the delay is minimal and the opposing party suffers no prejudice. *Cf. Sapp v. Propeller Co. LLC*, 12 A.D.3d 218, 784 N.Y.S.2d 532, 533 (1st Dep't 2004).

 Second, Coraud asserts that Section 687(5) of the NYSFA, which prohibits waivers of "any ... liability imposed by" the NYSFA, prohibits a waiver of punitive and exemplary damages. To the contrary, Section 687(5) is inapplicable here because nothing in the NYSFA permits a franchisee to seek such damages. "To determine whether punitive damages are legally permissible in a court action [courts must] look to the statute—not to

whether the nature of the wrong alleged would permit recovery under traditional concepts of punitive damages in tort law." *Thoreson v. Penthouse Int'l, Ltd.*, 80 N.Y.2d 490, 496, 591 N.Y.S.2d 978, 606 N.E.2d 1369 (1992). Here, the NYSFA provides franchisees with a cause of action to seek "damages" and, where a violation is "willful and material," rescission. *Id.* § 691(1). Although "damages" may in some circumstances encompass punitive or exemplary damages, the structure of Section 691(1)—creating one remedy for a standard violation and another for a willful violation—counsels that the NYSFA does not permit franchisees to seek punitive damages. Bolstering this interpretation is the fact that a franchisee cannot bring suit if it refuses a written offer from the franchisor to refund the consideration, with interest, paid by the franchisee for the franchise. *Id.* § 691(2). The presence of this statutory safety valve for franchisors strongly suggests that the NYSFA is not designed to punish and that punitive and exemplary damages are, therefore, unavailable. From this, the Court concludes that the NYSFA does not permit recovery of punitive and exemplary damages and that, as a result, enforcement of the contractual waiver of such damages does not offend Section 687(5).

Accordingly, for the foregoing reasons, the Court reaffirms its March 2, 2015 Order granting in part and denying in part defendants' motion to dismiss.