**CORAUD LLC, Plaintiff,**

v.

**KIDVILLE FRANCHISE COMPANY, LLC, Andrew Stenzler, Harry R. Harwood, Jr., Ash Robinson, and Joseph Sexton, Defendants.**

No. 14–cv–9105 (JSR).

United States District Court, S.D. New York.

Signed Aug. 15, 2015.

388

William Michael Garner, Garner & Ginsburg, PA, Minneapolis, MN, for Plaintiff.

Kevin Michael Shelley, Kaufmann Gildin & Robbins LLP, New York, NY, for Defendant.

## MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

In April 2012, husband and wife Paul and Catharine Wilder formed plaintiff Coraud LLC ("Coraud") for the purpose of entering into a franchise agreement with defendant Kidville Franchise Company, LLC ("Kidville"), a franchisor of child entertainment facilities. The investment proved unsuccessful and, after a year-and-a-half of operating at a loss, Coraud filed this lawsuit against Kidville and certain of its officers and employees, asserting violations of state franchise laws and various common law causes of action. Now pending before the Court is Coraud's motion for summary judgment, in which it asks the Court to (1) enter summary judgment finding Kidville liable for violations of Sections 683 and 687 of the New York Franchise Sales Act ("NYSFA") and for negligent misrepresentation, (2) dismiss Kidville's counterclaim for breach of contract, and (3) enter summary judgment finding co-defendant Andrew Stenzler, Kidville's former Chief Executive Officer, liable for materially aiding in a violation of the NYSFA. Stenzler, for his part, cross-moves for summary judgment dismissing him from the case.[1]

---

1. Kidville, for its part, moved the Court to dismiss certain aspects of Coraud's breach of

The pertinent facts, either undisputed or, where disputed, taken most favorably to defendants, are as follows. Wilders first became interested in opening a Kidville franchise after visiting Kidville's Hoboken, New Jersey facility with their own children. Plaintiff's L.R. 56.1 Statement of Undisputed Facts ("Pl.'s 56.1 Statement"), ECF Dkt. No. 35, ¶ 5. At the time, the Wilders had been contemplating starting a business so that Catharine Wilder, who had previously worked in the health care field, could pursue a second career. Declaration of Paul Wilder ("P. Wilder Decl."), ECF Dkt. No. 32, ¶ 3. Although the Wilders had saved $450,000 for this purpose, *see* Pl.'s 56.1 Statement ¶ 5, neither had any experience running a small business, building out a commercial space, or working with commercial landlords, *see* P. Wilder Decl. ¶ 5.

In 2011, the Wilders reached out to Kidville to learn more about the possibility of becoming franchisees, and Kidville provided them with its Franchise Disclosure Document ("FDD"). Pl.'s 56.1 Statement ¶ 10. The FDD is an offering prospectus that, under Section 683 of the NYSFA, franchisors, except in circumstances not relevant here, must register with the state of New York, distribute to potential franchisees, and update on an annual basis. Of particular relevance to the instant motions is "Item 7" of the FDD, which the franchisor must disclose certain specified categories of expenses related to the fran-

chisee's "estimated initial investment" as well as a total estimate of those costs. *See* N.Y. Comp.Codes R. & Regs. tit. 13, § 200.2. Item 7 of Kidville's 2011 FDD lists sixteen different categories of expenditures, with estimates of the costs for most categories and accompanying footnotes that explain qualifications pertaining to some of those estimates. Declaration of Michael Garner ("Garner Decl."), Attachment 9, Item 7, at 19–20.[2] For an "annex facility" (the cheaper and smaller alternative of the two types of franchise outlets that Kidville offered for sale) Item 7 discloses a total estimated initial investment of $259,405 to $417,750, exclusive of the cost of purchasing or leasing real estate and placing a security deposit with a landlord. *Id.* at 20.

After receiving Kidville's FDD, the Wilders continued to investigate the opportunity by speaking with other Kidville franchisees. During the relevant time period, Kidville had four franchisees, each of whom had opened an annex facility in 2010. P. Wilder Decl. ¶ 12. The Wilders reached out to three of these franchisees and were able to speak with two. *Id.* Catharine Wilder testified at her deposition that a Kidville franchisee operating in Scarsdale, New York told her that he had "invested" $500,000 and was bringing in $20,000 to $25,000 in revenues per month, which was "much lower" than the Wilders' "numbers ... in [a] business model" that

contract claim on the ground that "there is no contractual obligation in the parties' Kidville Franchise Agreement requiring Kidville to provide [Coraud] with public relations support or curriculum materials." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, ECF Dkt. No. 37, at 7–8. At oral argument, Kidville narrowed its motion to only seeking dismissal of the breach of contract claim as it related to the provision of curriculum materials, and Coraud, in turn, agreed not to pursue any such curriculum materials claim. As a conse-

quence of these joint concessions, Kidville's motion was rendered moot.

**2.** Excerpts of testimony from depositions that Mr. Garner has attached to his declaration are not labeled as "exhibits." The result is that "Exhibit 3" to Mr. Garner's declaration is the ninth attachment on ECF. For the avoidance of doubt, the Court's citations refer to manner in which the documents are referenced on ECF.

they had created based, on what they had been told by Kidville. Declaration of Rammy Harwood ("Harwood Decl."), Ex. B, Deposition of Catharine Wilder ("Catharine Wilder Depo."), at 84:12–17. The Wilders reported this conversation to Joe Sexton, Kidville's Senior Manager of Franchise Development, who, according to Catharine Wilder, stated that the Scarsdale franchisee "was not a reliable source" and "not a good operator." *Id.* at 83:20–24.

Catharine Wilder also spoke with the Kidville franchisee operating in Hoboken. Similar to the Scarsdale franchisee, the Hoboken franchisee stated that the "build-out cost was higher than" the number that was in Item 7, and she also added that the Wilders would not be able to provide as many classes (a source of revenue) per day as they had anticipated. *Id.* at 85:24–86:20. The Hoboken franchisee refused, however, to provide the Wilders with her financial data. *Id.* at 86:21–23. Catharine Wilder testified at her deposition that she informed Sexton of this conversation as well.

Apparently undeterred by these conversations, the Wilders engaged "experienced" franchise attorneys to review the "franchise documents," formed plaintiff Coraud, and, through it, entered into a franchise agreement with Kidville on April 13, 2012. *See* P. Wilder Decl. ¶ 29; Pl.'s 56.1 Statement ¶ 18. The Franchise Agreement provided Coraud with a ten-year license to operate an annex facility. Garner Decl., Attachment 25 ("Franchise Agreement"), ¶ 1.D. It also obligated Coraud to "[e]stablish[ ] a brand fund" to which they "agree[d] to contribute ... monthly amounts" based on gross sales and to pay Kidville a royalty based on gross sales. *Id.* ¶¶ 3.B, 9.B. After signing the Franchise Agreement, the Wilders "proceeded to find space, go through zon-

ing hearings, hire contractors, build out the space, [and] hire employees." P. Wilder Decl. ¶ 13.

Through the process of opening the franchise, Coraud alleges that it learned of numerous material misstatements and omissions in Item 7 of the FDD. Specifically, Coraud contends that the estimated cost for leasehold improvements excludes expenses that Kidville tacitly but incorrectly assumed that the landlord would pay for and otherwise failed to reflect Kidville's actual experience; that the estimate for a security deposit incorrectly asserted that some landlords require only one month's rent; that the estimate for lawyers' fees failed to account for the costs associated with zoning hearings; that the estimates for training expenses did not include the cost of paying labor; that the estimate for computers did not include installation expenses; and that Item 7 failed to mention at all the cost of paying labor during any delays in opening. All told, the Wilders spent $743,826, more than $300,000 above the top-end estimate, to open their facility in Westfield, New Jersey. Pl.'s 56.1 Statement ¶ 103.

After incurring these costs, Coraud opened its facility in June of 2013. P. Wilder Decl. ¶ 13. In its first year of operation, Coraud made no profit, and its "resources were being depleted." Pl.'s 56.1 Statement ¶ 104. Further, because the initial investment had "far exceeded [the Wilders'] budget, [Coraud] had very little margin to work with once [it] started." *Id.* ¶ 103. By April 2014, less than a year after opening, the Wilders informed Kidville that they believed they had legal claims, and in November 2014, Coraud filed this suit and attempted to sell the franchise. *Id.* ¶¶ 105–06. Unable to find a buyer, Coraud sold certain equipment and inventory and, in February 2015, closed its doors. *Id.* ¶ 106.

"A party moving for summary judgment bears the burden of establishing that there exists no genuine issue of material fact warranting a trial." *Gummo v. Vill. of Depew, N.Y.,* 75 F.3d 98, 107 (2d Cir.1996). "[T]he burden of the nonmovant to respond arises only if the motion is properly supported—and therefore summary judgment only is appropriate when the moving party has met its burden of production under Fed.R.Civ.P. 56(c) to show initially the absence of a genuine issue concerning any material fact. If the evidence ... does not meet this burden, summary judgment must be denied even if no opposing evidentiary matter is presented." *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001) (internal quotation marks, citation, and emphasis omitted). "In ruling on [a motion for summary judgment], the district court must view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party." *Gummo,* 75 F.3d at 107.

■ The Court turns first to Coraud's claim under the anti-fraud provisions of the NYSFA. In relevant part, Section 687 of the NYSFA (which is largely but not entirely modelled on S.E.C. Rule 10b–5) states,

It is unlawful for a person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. It is an affirmative defense to one accused of omitting to state such a material fact that

said omission was not an intentional act.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

N.Y. Gen. Bus. Law § 687(2). "To state a claim under § 687, [a plaintiff] must plead that (1) [the defendant] made an untrue or misleading statement of material fact, and that (2) [the plaintiff] reasonably relied on that statement, (3) causing harm to [the plaintiff]." *Governara v. 7–Eleven, Inc.,* 2014 WL 4476534, at *4 (S.D.N.Y. Aug. 20, 2014). The Court finds that summary judgment is inappropriate with respect to each of these three elements.

■ The principal alleged misstatement on which Coraud's claim rests concerns the cost of "Leasehold Improvements and Fixtures," which Item 7 of Kidville's FDD estimated would range from $22,500 to $137,600 but on which Coraud asserts it spent $296,154. *See* Item 7 at 20; Garner Decl., Attachment 26, Comparison of Item 7 to Coraud's Actual Cost. According to Coraud, the cost range is misleading because it fails to reflect that Kidville spent $338,797 opening a facility in Park Slope and $556,587 opening one in Tribeca. *See* Pl. 56.1 Statement ¶ 55. Additionally, Coraud continues, the estimate improperly omits any mention of numerous expenses that Kidville assumed that the franchisee's landlord would cover, a fact that Coraud allegedly only discovered after it signed the Franchise Agreement. At that time, Kidville provided Coraud with a form letter of intent for negotiations with a landlord that included a "Schedule B" itemizing these allegedly hidden expenditures. *See* Pl.'s 56.1 Statement ¶¶ 44–45, 55. Kidville responds, however, that the costs of construction incurred in connection with the Tribeca and Park Slope outlets, which are located in high-end neighborhoods and

purchased in "as is" condition, are not representative, see Harwood Decl. ¶ 9, and that, although the FDD does not disclose all of the specifics pertaining to the expenditures that Kidville assumed that a landlord may cover, an explanatory note in Item 7 does state that "These numbers . . . already take into account a possible landlord contribution of between $70,000 to $103,750 and items provided by the landlord such as HVAC." Item 7 at 20; Garner Decl., Ex. 1, Deposition of Rammy Harwood ("Harwood Depo.") at 228:16–22. While Coraud responds that this "landlord contribution" is different from the "Schedule B" costs, see Pl.'s 56.1 Statement ¶ 39, it fails to explain how.

As is plain, there is a genuine dispute regarding whether the Item 7 estimate of the cost of "Leasehold Improvements and Fixtures" constituted a material misstatement. Similar disputes and shortcomings in proof preclude summary judgment with respect to the other alleged misstatements and omissions in Kidville's Item 7.[3] Accordingly, the Court rejects the conclusion that Kidville's Item 7 or any specific representation therein was, as a matter of law, materially misleading.

▇▇▇ Genuine disputes of material fact also exist with respect to the reasonable reliance element of a Section 687 claim. "New York takes a 'contextual view' in deciding whether reliance was reasonable." *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *14 (S.D.N.Y. Oct. 31, 2011) (quoting *J.P. Morgan Chase Bank v. Winnick*, 350 F.Supp.2d 393, 406 (S.D.N.Y.2004)). Among the factors a court may consider in assessing the reasonableness of an investor's reliance is whether the investor received any "clear and direct" signs of falsity, see *Winnick*, 350 F.Supp.2d at 408; whether the investor had access to relevant information, see *Sawabeh Info. Servs. Co. v. Brody*, 832 F.Supp.2d 280, 297–98 (S.D.N.Y.2011); whether the investor received a written (purported) confirmation of the truthfulness of the representations at issue, see *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154–55, 905 N.Y.S.2d 118, 931 N.E.2d 87 (2010), and whether the investor is "sophisticated," see *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir.2006). As this multi-factor analysis suggests, "[t]he question of what constitutes reasonable reliance is . . . nettlesome because it is so fact-intensive," *DDJ Mgmt.*, 15 N.Y.3d at 155, 905 N.Y.S.2d 118, 931 N.E.2d 87 (internal quotation marks omitted), and reasonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment. See, e.g., *Brunetti v. Musallam*, 11 A.D.3d 280, 783 N.Y.S.2d 347, 349 (1st Dep't 2004).

---

3. To take one example, Coraud asserts that the estimate for "professional fees" omitted the cost of hiring lawyers for assistance with zoning hearings. Even accepting Coraud's premise that such costs should have been included (although zoning hearings do not take place in every state and Item 7 cautions potential franchisees to "investigate specific costs in your area," see Item 7 at 22), Coraud has not established how expensive such assistance is in the normal course. Although Coraud spent $2,500, Pl.'s 56.1 Statement ¶ 92, there is no indication that this amount is representative of franchisees' experiences in the normal course; indeed, Coraud asserts that it had to attend multiple zoning hearings over the course of three months, see id. ¶ 98. In the absence of such evidence and drawing all inferences in the non-movant's favor, the Court cannot conclude that the omission was "material" such that there is a "substantial likelihood" that a reasonable investor would have viewed inclusion of the omitted fact as "significantly alter[ing] the total mix" of information available. See State of New York v. Rachmani Corp., 71 N.Y.2d 718, 726, 530 N.Y.S.2d 58, 525 N.E.2d 704 (1988).

Here, the information the Wilders received from other franchisees creates a genuine dispute regarding whether their subsequent reliance on Kidville's FDD was reasonable. The Hoboken franchisee informed Catharine Wilder that her "build-out cost was higher" than the range contained in Item 7 and the Scarsdale franchisee told her that he "invested" $500,000, which also exceeded the range disclosed in Item 7. Catharine Wilder Depo. at 84:12–23, 85:24–86:3. Further, both franchisees reported that their revenues were lower than expected. *Id.* at 84:14–17, 86:4–20. Together, these communications provided the Wilders with reason to question the figures with which they were allegedly most concerned—the initial investment costs disclosed in Item 7—and to question the entire body of information that Kidville had provided, as both franchisees also reported that their anticipated revenues were inflated. Nevertheless, the Wilders continued to rely on the disclosures contained in Item 7 without obtaining any documentary proof or any specific representations as to the accuracy of that information. A factfinder could well conclude that their reliance was unreasonable.

Coraud attempts to escape the implications of Catharine Wilder's interactions with the other franchisees, but its arguments are better suited for trial than for summary judgment. Catharine Wilder submitted a supplemental declaration to "clarify" that the Scarsdale franchisee only stated that he was "in the hole" $500,000, not that his initial investment totaled $500,000. *See* Supplemental Declaration of Catharine Wilder in Support of Coraud's Motion for Partial Summary Judgment, ECF Dkt. No. 52, ¶ 2. This is in tension with her deposition testimony.

She also she reframes the Hoboken franchisee's comment as one made "in passing" and without "alarm." *Id.* This casual disregard of information pertaining to investment costs is difficult to reconcile with the repeated emphasis in Coraud's motion papers and the Wilders' declarations on the importance of the fact that the initial investment was within their alleged budget of $450,000. Coraud also stresses that Sexton told the Wilders to disregard the Scarsdale franchisee's information as unreliable. Sexton's response, however, was not the equivalent of a confirmation of the accuracy of the estimates in Item 7—the Scarsdale franchisee commented on his revenues as well as his investments—and, in any event, the Wilders' failed to elicit a similar explanation regarding the information provided by the Hoboken franchisee. Finally, Coraud falls back on the Wilders' alleged lack of sophistication, but the record discloses that both Paul and Catharine Wilder had successful careers in the health care field, with Catharine making $230,000 per year. Declaration of Catharine Wilder in Support of Coraud's Motion for Partial Summary Judgment ("C. Wilder Decl."), ECF Dkt. No. 33, ¶ 5; P. Wilder Decl. ¶ 3. Given that the allegedly misleading information at issue concerned matters such as costs of construction, the amount of security deposit commercial landlords require, and the cost to purchase and install computers, the Court, drawing all inferences in Kidville's favor, cannot conclude that the Wilders would have been unable to discover and understand the information that would reveal the (allegedly) misleading nature of Kidville's FDD.[4] The Wilders may not have been sophisticated investors, but this was not a particularly complex financial transaction. In short, these are all arguments that Coraud can make at trial,

---

4. Although Catharine Wilder testified that the Hoboken franchisee refused to provide financial information, Coraud has not identified any evidence showing that the Scarsdale franchisee or Kidville itself similarly refused the Wilders' requests for documentation.

but none of them eliminates the issue of fact as to reasonable reliance that arises from the Wilders relative disregard of red flags pertaining to the accuracy of the information in the FDD.

■ As for causation of damages, Coraud has failed to carry even its burden of production. Under New York law, "[t]o establish causation, [a] plaintiff must show both that [the] defendant's misrepresentation induced [the] plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which [the] plaintiff complains (loss causation)." *Laub v. Faessel,* 297 A.D.2d 28, 745 N.Y.S.2d 534, 536 (1st Dep't 2002). The Wilders damages claim is comprised of Catharine Wilder's "lost wages" for the three years she dedicated to pursuing their investment in Kidville and the expenses that Coraud incurred opening and operating the franchise. Coraud, however, has not submitted sufficient evidence to show, as a matter of law, that the alleged misstatements and omissions in the FDD "directly caused" these losses.

With respect to Catharine Wilder's lost wages, the only evidence that Coraud has submitted is Catherine's averment that she earned $230,000 per year before the events at issue and that she "would have returned to work and earned a similar salary that would have continued for the three years that [she was] involved with Kidville." C. Wilder Decl. ¶ 5. Coraud has not proffered evidence establishing that Catharine quit a job to start the franchise, that she received a job offer while working on the franchise, that there was significant demand for her

services in the industry at the time, or anything similar that would permit summary judgment.

The evidence that Coraud has offered in support of its claim that the alleged misstatements and omissions proximately caused Coraud's operating losses is equally insufficient. Other than a single statement in Paul Wilder's declaration that the costs that Coraud incurred in excess of the amount estimated in Item 7 left Coraud with "very little margin to work with once [it] started," P. Wilder Decl. ¶ 34, all of Coraud's evidence focuses on "transaction causation." And that single sentence— which does not establish, for example, that additional funds would have permitted Coraud to make a key purchase or to stay open long enough to turn the corner to profitability—is too little on its own for Coraud to prevail at this stage of the proceedings.

■ Moving to Coraud's next cause of action, the Court denies summary judgment with respect to Coraud's claim under Section 683 of the NYSFA. As noted above, Section 683 requires that a franchisor, before it offers to sell a franchise, register an FDD with the state, and mandates that the FDD "contain the information and representations set forth in and required by" Section 683 and its implementing regulations. *See* N.Y. Gen. Bus. Law §§ 683(2), 683(2)(u). Assuming, *arguendo*, that Coraud properly asserts a claim under Section 683,[5] it must still prove that Kidville's alleged noncompliance with Section 683 caused Coraud's damages, *see A Love of Food I, LLC v. Maoz*

---

5. Where, as here, the basis for a Section 683 claim is that the FDD contains misstatements or omissions relevant to required disclosures, Section 687(1) of the NYSFA would seem to apply. That provision makes it "unlawful for any person to make any untrue statement of a material fact in any ... prospectus ... filed with the department [of law] under this article, or wilfully to omit to state in any such ... prospectus ... any material fact which is required to be stated therein" and thereby imposes a materiality requirement and, potentially, a reasonable reliance requirement.

*Vegetarian USA, Inc.*, 70 F.Supp.3d 376, 408–09 (D.D.C.2014) (applying the NYS-FA), and for the reasons stated above, it has failed to do so.[6]

 The same considerations articulated above also defeat Coraud's motion with respect to its negligent misrepresentation · claim. Under New Jersey law, which the parties agree applies pursuant to a choice-of-law provision in the Franchise Agreement, "[a] cause of action for negligent misrepresentation may exist when a party negligently provides false information. A negligent misrepresentation constitutes an incorrect statement, negligently made and justifiably relied on, and may be the basis for recovery of damages for economic loss sustained as a consequence of that reliance." *Singer v. Beach Trading Co.*, 379 N.J.Super. 63, 73–74, 876 A.2d 885 (App.Div.2005). Neither party argues that New Jersey's law on reasonable reliance or causation of damages differs from New York's, ·and Coraud's proof is therefore deficient here too. Accordingly, the Court denies summary judgment on this claim.

Coraud next asks the Court to dismiss (by way of summary judgment) Kidville's counterclaim for breach of contract based on Coraud's alleged failure to fulfill its obligations under the Franchise Agreement. The specific target of Coraud's motion is the damages component of Kidville's counterclaim. The Franchise Agreement requires Coraud to contribute both "brand fund fees" and to pay a royalty to Kidville, both of which are based on Coraud's gross sales, Franchise Agreement ¶¶ 3.B, 9.B, and Kidville claims the brand fund fees and royalties that it would have received had Coraud remained in business as lost profits. To arrive at a dollar amount of those lost fees and royalties, Kidville's current CEO, Rammy Harwood, calculated three alternative projections of Coraud's growth over eight years, the amount of time left on the Franchise Agreement at the time Coraud ceased operations. Pl. 56.1 Statement ¶ 116. If Coraud experienced no growth, Kidville's alleged damages would be $193,061; if Coraud experienced 8.21 percent growth—the historical average growth·rate of ten of eleven Kidville franchises after their first year of business—Kidville's alleged damages would be $263,952; and if Coraud experienced 16.74 percent growth—the rate of growth of all Kidville franchises from 2013 to 2014—Kidville's alleged damages would be $364,939. *See* Garner Decl., Attachment 29, Kidville Franchise Company, LLC's Response to First Set of Interrogatories of Counterclaim Defendant and Third Party Defendants.[7]

 "Lost profits are one measure of·compensatory damages that may be recoverable in a breach of contract action, if they can be established with a 'reasonable degree of certainty.'" *RSB Lab. Servs., Inc. v. BSI, Corp.*, 368 N.J.Super. 540, 555, 847 A.2d 599 (App.Div.2004) (quoting *Stanley Co. of Am. v. Hercules·Powder Co.*, 16

---

6. Coraud also seeks recovery on the ground that Kidville's FDD does not comply with the formatting requirements of Federal Trade Commission's regulations governing franchise disclosure documents. *See* 16 C.F.R. § 436.5. Even if such technical violations could have caused Coraud damages (a doubtful proposition),. Coraud has failed to point to any New York statute or regulation providing it with the right to sue to enforce these requirements, and courts have uniformly rejected the claim

that a private right of action to enforce the FTC's requirements exists. *See A Love of Food I*, 70 F.Supp.3d at 382 (collecting cases).

7. Because the fees and royalties would be received on a monthly basis throughout the duration of the agreement, Harwood's calculations reflect (or purport to reflect) the net present value of amounts owed in the future.

N.J. 295, 314, 108 A.2d 616 (1954)). The party claiming lost profits must establish not only the revenue that it would have received absent the breach of contract, but also what costs it avoids as a result of being relieved of its obligations under the contract. *See Cromartie v. Carteret Sav. & Loan,* 277 N.J.Super. 88, 103, 649 A.2d 76 (App.Div.1994). Although proof of lost profits requires more than factually unsupported opinion evidence, New Jersey law does not demand "precision" and, in fact, "permit[s] considerable speculation by the trier of fact as to damages." *V.A.L. Floors, Inc. v. Westminster Communities, Inc.,* 355 N.J.Super. 416, 424–25, 810 A.2d 625 (App.Div.2002). Hence, "[p]rofits lost by reason of breach of contract may be recovered 'if there are *any criteria* by which probable profits can be estimated with reasonable certainty.'" *Id.* at 425, 810 A.2d 625 (quoting *Feldman v. Jacob Branfman & Son, Inc.,* 111 N.J.L. 37, 42, 166 A. 126 (E & A 1933)) (emphasis added). Coraud argues that, even under this forgiving standard, Kidville's damages claim fails as a matter of law because it relies on revenue projections unsupported by facts and does not account for expenses saved.

▮▮▮▮ While the Court is skeptical that Kidville will prevail in proving its damages with sufficient certainty at trial, Kidville has submitted enough evidence to survive summary judgment. With respect to lost revenues, Kidville's two damages calculations projecting that Coraud will experience growth are based on the historical experience of Kidville outlets that sell the same services; though those franchises exist in different locations, Kidville may be able to prove that Coraud is nonetheless in materially the same position. *Cf. id.* ("Past experience of an ongoing, successful business provides a reasonable basis for the computation of lost profits with a satisfactory degree of definiteness.") (internal quotation marks omitted). As for Kidville's projection based on Coraud experiencing no growth, it remains to be seen whether Kidville can establish that Coraud, though it was sustaining a loss when it closed its doors, could have cut expenses in subsequent years. With respect to saved expenses, Harwood has asserted that "Kidville does not incur any marginal cost to provide services to any given franchisee."[8] Harwood Decl. ¶ 44. If Kidville can establish this at trial, then the lost brand fund fees and royalties, without any reduction, will be an accurate measure of its lost profits.

Coraud also takes the position that Kidville cannot collect damages derived from lost future fees and royalties until the Franchise Agreement is formally terminated, which has yet to occur here. Coraud bases this assertion on a series of cases that have rejected lost profit claims from franchisors because "the franchisees' breaches were not proximately connected to the lost future royalty payments, but rather, it was the franchisors' terminations that proximately caused the future losses." *Dunkin' Donuts, Inc. v. Arkay Donuts, LLC,* No. Civ. 05–387, 2006 WL 2417241, at *5 (D.N.J. Aug. 21, 2006) (collecting cases).

Coraud's interpretation of this case law is mistaken. These cases do not stand for the proposition that formal termination of

---

8. Coraud claims that Harwood's deposition testimony conflicts with the statement in his declaration regarding the absence of any marginal cost and that the latter should therefore be barred under the "sham affidavit" rule, *see Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969), but Harwood testified only that Kidville spends money to provide service to its franchisees, *see* Harwood Depo. at 62:14–63:10, not that it spends separate sums on each franchisee.

a Franchise Agreement is a prerequisite to a franchisor's recovery of lost profits. Rather, they apply the general rule that a party claiming damages must prove that the defendant's unlawful conduct was the proximate cause of those damages and then conclude that, if "the franchisor's own decision to terminate the franchise agreement . . . deprived it of its entitlement to those future royalty payments," the franchisee is not liable. *See Postal Instant Press, Inc. v. Sealy*, 43 Cal.App.4th 1704, 1710–11, 51 Cal.Rptr.2d 365 (1996). Whatever the merits of that reasoning in cases where the franchisor terminates the agreement—which appears to be the subject of some debate, *see Moran Indus., Inc. v. Mr. Transmission of Chattanooga, Inc.*, 725 F.Supp.2d 712, 721 (E.D.Tenn.2010) ("*Sealy* has come under scrutiny from courts and commentators alike in recent years."); *Radisson Hotels Int'l, Inc. v. Majestic Towers, Inc.*, 488 F.Supp.2d 953, 963 n. 10 (C.D.Cal.2007) ("[T]his Court believes that the *Sealy* decision is mistaken.")—it has little bearing on cases, as here, where it is the franchisee's "own decision" to cease operating that allegedly deprives a franchisor of future profits. Recognizing this, "[c]ourts have generally permitted a franchisor to recover future royalties when the franchisee . . . abandons the franchise." *Kiddie Acad. Domestic Franchising LLC v. Faith Enterprises DC, LLC*, No. 07 Civ. 0705, 2010 WL 673112, at *5 (D.Md. Feb. 22, 2010); *see also, e.g., Burger King Corp. v. Hinton, Inc.*, 203 F.Supp.2d 1357, 1367 (S.D.Fla.

2002) (distinguishing franchisor termination from when a franchisee "abandon[s]" its obligations by "closing the franchise and ceasing performance under the Franchise Agreement").[9] Accordingly, the Court denies Coraud's motion for summary judgment dismissing Kidville's counterclaim.

Finally, the Court turns to Coraud's motion for summary judgment against Andrew Stenzler and Stenzler's cross-motion for summary judgment dismissing him from the case. As discussed above, a franchisor must first register a prospectus (the FDD) before it may begin offering to sell franchises in New York. *See* New York Gen. Bus. Law § 683(1). By statute, a prerequisite to registration is that the FDD contain "[a] representation that the registered prospectus does not knowingly omit any material fact or contain any untrue statement of a material fact." *Id.* § 683(2)(s). By regulation, this representation must be made "by the chief executive officer or a general partner of the applicant . . . [or] by another person holding a power of attorney for such purposes so long as the agent has a personal knowledge of the information contained in the application and prospectus." N.Y. Comp. Codes R. & Regs. tit. 13, § 200.3(d). Stenzler took responsibility for this task when Kidville registered its FDD in 2011, and, in connection with the registration process, he certified, "I have read and know the contents of this application, including the Franchise Disclosure Document. . . . and

---

**9.** Coraud also suggests that Kidville's damages claim is premature because, as the Franchise Agreement has not yet been terminated, Coraud could theoretically reopen its facility or sell its license. Putting to one side that Coraud has proffered no evidence showing that this is even a remote possibility—and in fact, has affirmatively asserted that it sold its equipment and inventory after it was unable to sell the franchise—the Court can account

for the possibility of double recovery in any order awarding Kidville lost profits by, for example, requiring Kidville to turn over any royalties it receives in the event that Coraud sells the franchise. At a minimum, the Court can award lost profits from the time of Coraud's abandonment of the franchise to the entry of judgment without risking double recovery. *See Kiddie Acad.*, 2010 WL 673112, at *6 (D.Md. Feb. 22, 2010).

that all material facts stated ... are accurate and ... do not contain any material omissions. I further certify that I ... make this certification ... upon my personal knowledge." Gardner Decl. Attachment 23. Stenzler now admits, however, that he did not review the FDD on a page-by-page basis, that he did not investigate the accuracy of its contents, and that he was not involved in its preparation. Pl.'s 56.1 Statement ¶ 111. All he did was "ask if [the franchise department] did everything they were supposed to do." *Id.*

An individual may be found liable for a violation of the NYSFA in two ways. First, under Section 691(1), "the Act directly imposes sanctions upon the personal commission of statutory violations by corporate officers, directors, and controlling persons." *See A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.,* 87 N.Y.2d 574, 582, 640 N.Y.S.2d 849, 663 N.E.2d 890 (1996); N.Y. Gen. Bus. Law § 691(1) ("A person who offers or sells a franchise in violation of section six hundred eighty-three, six hundred eighty-four or six hundred eighty-seven of this article is liable to the person purchasing the franchise for damages...."). Second, "where a statutorily defined person affiliated with the franchisor does not personally violate the Act by participating in the fraudulent franchise offer or sale, he or she may still be held liable [under Section 691(3)] for the statutory violations of others if his or her actions materially aided the violation." *Id.* Specifically, Section 691(3) of the NYS-FA imposes joint and several liability on a control person of a franchisor or an employee thereof "who materially aids in the act o[r] transaction constituting the violation;" though "[i]t shall be a defense to any action based upon such liability that the defendant did not know or could not have known by the exercise of due diligence the facts upon which the action is predicated." N.Y. Gen. Bus. Law § 691(3).

The dispute between the parties concerns whether, in this case, Stenzler's certification of the truth of the contents of the FDD "materially aid[ed]" Kidville's alleged violation of Section 687 and Section 683. Based on the present record, the Court is unable to definitively answer this question in favor of either party. Stenzler's certification satisfied a statutory prerequisite to the registration of the FDD, which, in turn, provided Kidville with legal authority to distribute the FDD to potential franchisees like the Wilders. The Court thinks it highly likely that this materially aided in the alleged violation of the NYSFA. The Wilders engaged "experienced" counsel before signing the Franchise agreement, see P. Wilder Decl. ¶ 29, and that counsel likely would have advised the Wilders not to enter into the Franchise Agreement if Kidville had not satisfied New York's registration requirements. Additionally, the Wilders performed their own due diligence before entering into the agreement and may have been unwilling to enter into a franchise agreement with an unregistered franchisor. However, to rest a decision on summary judgment on this reasoning would be to inappropriately draw an inference in favor of the moving party, and so the Court declines to do so. Coraud's motion is therefore denied. Conversely, to assume (though the Court has no inclination to do so) that neither the Wilders' nor their counsel would have paid any mind to a lack of registration would draw an improper inference for Stenzler, and so the Court denies his cross-motion as well. Thus, to prevail against Stenzler at trial, Coraud must prove that the "act or transaction constituting the violation" that caused Coraud's alleged damages is Kidville's sale of a franchise pursuant to a misleading, but properly registered, FDD.

In reaching this conclusion, the Court necessarily rejects Kidville's argu-

ment that the liability of an officer cannot be predicated on the officer's certification of the contents of a franchise disclosure document. Kidville warns that finding Stenzler liable under the circumstances here would conflict with the New York Court of Appeals' holding in *A.J. Temple Marble & Tile v. Union Carbide Marble Care* that a person's "position as a controlling person or director and officer" is insufficient on its own to constitute material aid, *see* 87 N.Y.2d 574, 584, 640 N.Y.S.2d 849, 663 N.E.2d 890 (1996), and would unduly expand liability for the officers of franchisors. These concerns are overblown. The Court's decision rests on Stenzler's certification of the FDD, not on Stenzler's status as an officer. Relatedly, officers of franchisors can avoid liability in their individual capacity by simply exercising due diligence in reviewing the contents of the FDD before they put their signature to a statement reciting that they have done just that. *See* N.Y. Gen. Bus. Law § 691(3). Alternatively, for officers who deem reliance on an affirmative defense too significant of a risk, the regulations governing the registration of an FDD permit the franchise to delegate responsibility for certifying the document to an agent "holding a power of attorney for such purposes so long as the agent has a personal knowledge of the information contained in the application and prospectus." N.Y. Comp.Codes R. & Regs. tit. 13, § 200.3(d).

■ The Court is likewise unpersuaded by Kidville's argument that a person must "actively participate" in the unlawful act before he or she may be found liable for materially aiding that act. Certainly such conduct is sufficient, *see Coraud LLC v. Kidville Franchise Co., LLC*, 109 F.Supp.3d 615, 622–23, No. 14 Civ. 9105, 2015 WL 3651423, at *6 (S.D.N.Y. June 12, 2015) (citing *Vysovsky v. Glassman*, No. 01 Civ. 2531, 2007 WL 3130562, at *19 (S.D.N.Y. Oct. 23, 2007)), but to say that it is required would be to rewrite the statute's language. Similarly, while the conduct that the *A.J. Temple* court found to constitute material aid was more extensive than Stenzler's and concerned a defendant who "directly participated in the unlawful franchise sales," 87 N.Y.2d at 584, 640 N.Y.S.2d 849, 663 N.E.2d 890, the Court of Appeals, as this Court has previously noted, *see Coraud*, 109 F.Supp.3d at 622–23, 2015 WL 3651423, at *6, did not purport to define "material aid" or to set a floor for such conduct. Indeed, to require "active" or "direct" participation in the unlawful act would arguably conflate primary and secondary liability under Section 691. As *A.J. Temple* explained in its more general pronouncement on the law, secondary liability is available when a defendant "does not personally violate the Act *by participating in the fraudulent franchise offer or sale*." 87 N.Y.2d at 582, 640 N.Y.S.2d 849, 663 N.E.2d 890 (emphasis added). Thus, Stenzler's certification of the FDD, if Coraud can show at trial that it was material in the above-described manner, is sufficient.

Accordingly, for the foregoing reasons, the Court denies, in their entirety, Coraud's motion for summary judgment and Stenzler's cross-motion for summary judgment. The parties are reminded that trial of this case will commence at 9:00 A.M. on November 9, 2015.

SO ORDERED.